### RODBLATT *v.* FOX
[No. 32, October Term, 1948.]

*Decided December 9, 1948.*

The cause was argued before DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*David J. Markoff* and *Bernard Rosen* for the appellant.

*Joseph W. Spector* for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal, in a non-jury case, from a judgment for defendant in a suit by a real estate broker for commissions. Plaintiff says that he was employed by defendant in May, 1946 to find a purchaser for defendant's grocery and package liquor business and stock at 1531 E. Preston Street and he found one or two purchasers ready, willing and able to buy on defendant's terms but

defendant refused to sell. Defendant denies that he ever employed plaintiff or ever agreed to sell to any purchaser procured by plaintiff. Plaintiff correctly says this case "should be decided on the facts". The trial judge saw and heard the witnesses. The testimony of the parties and other witnesses is flatly contradictory. Both parties vigorously attack the credibility of the opposing testimony. Unless the trial judge was clearly in error in not accepting plaintiff's evidence and rejecting defendant's, the judgment must be affirmed.

Defendant and his wife, as tenants by the entireties, owned the building in which the business was carried on; they lived over the store. Plaintiff says defendant in 1945 telephoned him and asked him to sell his business as his wife was very sick, and later told him his wife had just come home from the hospital and he was not going to sell it right then because he couldn't "go around idle" and was forced to change his mind. In May, 1946 defendant telephoned him again and said he had decided to sell for "$35,000 key-money" (for good will), plus the price (cost or value?) of the stock, and that if plaintiff got him the price he would get his commission; plaintiff asked for a written contract, but did not get one; plaintiff asked what was the average business per week, defendant said "about $33,000 to $35,000 a year"; plaintiff sent to defendant one Turk and later one Roskos (ostensibly two "prospects", but actually partners in the proposed venture), who were ready, willing and able to purchase, but defendant refused to sell. Defendant denies that he ever asked plaintiff to find him a purchaser, but says plaintiff importuned him to sell and he consented to let plaintiff send Turk, a person desiring to purchase, to look over the store; he says he did not tell Turk or Roskos he would sell the business (and sell or lease the building) but told both he would not sell unless he found some other place to go, especially because his mother-in-law was ill of an incurable disease.

On cross-examination, plaintiff said his understanding with defendant was that if he brought the customer to de-

fendant and defendant took that customer then he would get paid. The trial judge evidently found that this was the extent of the oral understanding between plaintiff and defendant; in his opinion he says, "The plaintiff was constantly importuning him to sell and finally he told Rodblatt that if he produced a purchaser who would meet his terms and *if he, the defendant, decided to sell,* Rodblatt's commission would be taken care of." Suit was instituted in October, 1946. In January, 1947 defendant advertised the business for sale in a cousin's real estate trade name; in June, 1947 defendant sold the business.

Turk says he went two or three times to look over the store, the first time with his mother, the second with Roskos; the first time he asked defendant whether the business was for sale and defendant said it was; defendant "took a piece of paper and wrote it down, what he made this week and what he made last"; he said, "I want this for the key, thirty-five thousand, and * * * this for the rent, one hundred and fifty dollars"; he "wrote it all down on this piece of paper which he then pushed over to me". The paper was not produced in evidence. The Turks went home and "talked it over"; they "wanted to think about it and to discuss it". Turk next went down with Roskos because he was looking for a partner to make it easier for him to purchase the business; he telephoned Roskos and asked him if he would be interested and Roskos said he would. Turk and Roskos did not then present a contract to defendant and sign it, because "a business of that size is not bought on a skip and a jump. It is thought over and discussed. That was the purpose of our discussing it to make sure that every move that we made was right". Some days later Turk gave the plaintiff a check, dated June 6, 1946, to the order of defendant, for $3500, bearing an endorsement "This check is a deposit for Sam Fox Grocery & Package Liquor Store at 531 E. Preston Street for store, fixtures, grocery stock and good-will, at the price of $35000 plus $ for $ for liquor stock subject to 5 year lease with 5 year privilege of renewal for entire building at $150.00 per month

with a guarantee of $3000 weekly business." Plaintiff says he showed defendant the check and left him a photostatic copy of it; defendant would not accept the check but asked a few days to think it over and make a decision; finally defendant said he couldn't make up his mind and was going to ask his uncle; a week after Turk had given plaintiff the check, Turk "got so disgusted" that he asked plaintiff "to give him his check back", which plaintiff did. Turk's mother corroborates his version of their visit; she "took it for granted that when a man says he does $3000 worth of business a week he would guarantee it"; Turk took Roskos down because it was too much for one person to buy a place like that. Defendant contradicts the Turks' testimony and says he never discussed terms with them; he was not then doing $3000 worth of business a week but plaintiff told him to say he was; when plaintiff showed him the check he told plaintiff he couldn't sell right then; he had previously told plaintiff he couldn't sell the store then, at any time or for any price, and explained that he would not think of selling the store because he had no house to move into. Defendant's wife corroborates his testimony that plaintiff importuned him to sell and he said he didn't want to sell but might consider it if he had somewhere to go.

Roskos says he went to the store twice, first with Turk, the second time with his father-in-law, both times before Turk gave plaintiff the check. He says defendant said the place would be for sale if he were able to get another place to go; on the second visit Roskos and his father-in-law "were under the impression that the place was for sale but [defendant] didn't say absolutely at that time that he was going to sell it. He was still hesitant." On or just before June 17, 1946 Roskos, his father-in-law and plaintiff met in a lawyer's office; Roskos told plaintiff his understanding was that defendant didn't want to sell right then, and plaintiff said, "Well, let's draw up a contract of sale and get a check made out and then as soon as possible I will submit it to [defendant] and see what he thinks about it." A written contract was accordingly

prepared with the understanding that they would try to purchase by springing a contract and a check on defendant. For this purpose plaintiff was given the draft of contract and a check (of Roskos, not of Turk), dated June 17, 1946, to the order of defendant, for $3500. This draft of contract contains provisions (some incomplete) which Roskos, as well as defendant, say had never been discussed with defendant, *e. g.,* provision for a transferable lease, the property to be sublettable, with an option to purchase for ———— dollars; a warranty that average weekly income from sales exceeds $2700, with a trial period of two weeks, option to terminate the agreement if during this period the average should not equal $2700, and a credit, against the purchase price, of the difference between sales and costs during the trial period.

In January, 1947 defendant advertised the business for sale in a newspaper, for $35,000, guaranteeing over $3000 business weekly. Plaintiff complains that defendant made use of his skill and experience as a broker, without paying for it, to determine what the business would sell for. If this be true, plaintiff could have saved his pains by taking, in addition to the unusual precaution of giving photostatic copies of checks, the usual precaution of insisting upon some written contract of employment. Incidentally, it may be remarked that the photograph of Turk's check had no pecuniary or artistic value and no legal potency, and there was no duty to return it or estoppel or other consequence from not returning it.

The evidence does not seem to show even a tentative agreement on terms of sale by defendant with plaintiff or either of his prospects, Turk or Roskos. At any rate we agree with the trial judge's conclusion that it does not show an unconditional contract of employment. We think the following "conclusions of fact," from conflicting evidence, in Judge France's opinion, are supported by the weight of the evidence, certainly are not clearly erroneous: "Mr. Rodblatt is a successful and energetic real estate broker dealing extensively in the sale of business properties. He sought out the defendant and vigorously

tried to persuade him to list the property with him for sale. The defendant refused to enter into any written agreement with the plaintiff and the court finds that at most the agreement between plaintiff and defendant was that plaintiff's commission was to be based, not on Rodblatt's producing a purchaser 'ready, willing and able to buy' but upon an actual sale. Rodblatt, an experienced broker, has not met the burden of proving the terms of the alleged verbal contract and must have realized that in the absence of a written contract of employment any time and effort he spent in procuring a prospective purchaser might be at his own risk. The court therefore finds that in the absence of any sale to a purchaser furnished by Rodblatt the judgment must be for the defendant."

*Judgment affirmed, with costs.*