GLASER ET UX. *v.* SHOSTACK, INDIVIDUALLY AND TRADING AS ASH REALTY COMPANY

[No. 200, October Term, 1956.]

384

*Decided May 13, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Herbert H. Rosenbaum,* for appellants.

*J. Paul Rocklin,* with whom were *Maurice J. Pressman* and *Norman P. Rocklin* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

Milton and Doris Glaser operated a tavern in a building in Baltimore owned by Doris and her brothers. They desired to sell the tavern business and ran a blind advertisement in the Sunday paper of August 29, 1954. One Mannes worked as a salesman for Harry Shostack, a licensed real estate broker who traded as Ash Realty Co. Mannes answered the advertisement by letter and thereafter was in personal contact with Milton Glaser. They made an oral agreement that Mannes was to attempt to sell the tavern business and, if successful, was to be paid an agreed percentage of the purchase price, which was to be $13,000 or more. Although Mannes had sold real estate for several years, he had not taken out a salesman's license, as then required by Code, 1951, Art. 56, Sec. 224. On August 20, 1954, he made application to the Maryland Real Estate Commission and procured the required bond from a surety company. On August 30, the Commission granted him a real estate salesman's license. Mannes' employer, Shostack, met Glaser several days after Mannes had talked to him and discussed various aspects of the proposed sale. Mannes procured one Sandler, a whiskey salesman, who was anxious to buy a tavern. Sandler inspected the tavern, went over the books, had his auditor talk to Glaser's auditor, checked the number of patrons on several occasions, and offered $12,500 for the goodwill, fixtures and equipment of the tavern. The stock of liquor on hand was to be paid for in addition. This offer was refused. Sometimes later, Sandler agreed to pay $13,250 for the tavern business "lock, stock and barrel", including the liquor on hand. In Shostack's office were three telephones. Mannes used one to call the Glasers to inform them of the offer

while Shostack and Sandler listened on extension telephones. Mrs. Glaser answered the call and was told of the offer and the fact that Sandler was ready to make a $500 deposit. She said her husband was asleep but that she would awaken him and get his answer. Testimony came in without objection that Mrs. Glaser left the telephone, shouted through the house, awakened her husband, and returned, saying that he had agreed that they would accept the offer. On hearing this, Sandler left the $500 deposit check with the Ash Realty Co. The parties were to meet at a lawyer's office several days later to sign a formal contract for the sale of the business and to make arrangements for the lease of the property in which the tavern operated from Doris Glaser and her brothers. Glaser did not keep the appointment at the lawyer's office and refused to consummate the sale. He claimed that he had never accepted Sandler's offer and that the night before the telephone call he had sold the tavern to another purchaser for $12,500, free of commission. Later, in fact, the tavern was transferred to the person named by him. Mannes died some months after the occurrences which have been recited and Shostack filed suit for the agreed commission. The trial court, sitting without a jury, found that the commission had been earned when the Glasers agreed to sell the tavern business for $13,250, and entered judgment for Shostack. He rejected Glaser's contention that the true agreement was that Mannes would be entitled to commission only if the property was actually sold to the purchaser produced by Mannes at a price that would net the Glasers $13,000. He did not specifically pass on, but must have rejected, the defense that there could be no recovery in any event, whatever the agreement, because Mannes was unlicensed and so, under Code, 1951, Art. 56, Sec. 235, the contract was void. That section provides that there can be no suit or recovery by one not licensed "* * * prior to the time of offering to perform any such act or service or procuring any promise or contract for the payment of compensation for any such contemplated act or service."

We think that there was enough in the record to sustain the judgment below. The evidence unquestionably was con-

flicting but permitted a finding by the trier of the facts that the Glasers had agreed with Mannes that if he provided a buyer for the tavern business, who was ready, willing and able to pay $13,000 or more for it, they would pay him a commission on the purchase price of 10% of the first $5,000 and 5% of the balance. The case is thus distinguishable on the facts from *Rodblatt v. Fox,* 191 Md. 620, relied on by the appellants, where the agreement as found by the trial court (said on appeal not to be clearly erroneous, at the least) was that commissions would be earned only by an actual sale, not upon the finding of a ready, able and willing purchaser. We find, too, that enough testimony came into the case without objection, although some of it was hearsay, to sustain the finding made by the court that the Glasers did in fact accept Sandler's offer of $13,250 for the tavern business, and that this substantiated the testimony of Shostack and Mannes (that of the latter being in his deposition, read into evidence), that the agreement was as they said it was and not as the Glasers would have the court believe it was. A written contract is not essential to the right of the broker to receive commissions. *Heslop v. Dieudonne,* 209 Md. 201; *Singer Construction Co. v. Goldsborough,* 147 Md. 628. It is clear that a broker may have earned his commissions even though the contract or agreement of sale he procured is unenforceable. In *Neuland v. Millison,* 188 Md. 594, Judge Markell, speaking of the broker, said for the Court: "If he had procured a purchaser who made an oral and hence unenforceable agreement to buy but was able and willing to perform the agreement, he would have been entitled to his commission." See also *Horn v. Seth,* 201 Md. 589, 594, and cases cited; and *Reh v. Bradley,* 211 Md. 431, 436.

Appellants' contention that recovery is to be defeated because Mannes was unlicensed on August 29 cannot prevail. The declaration alleges that the original agreement with Milton Glaser was made "on or about" August 29, 1954, and Shostack testified that the first contact was made on that day. Considerable doubt is thrown on the accuracy of this testimony by the fact that it is clear that the advertisement answered by Mannes was in the newspaper of August 29,.

and that the answer was by letter looking to an appointment, so that any personal meeting must have been on one of the following week days. Mannes became licensed on August 30, 1954. We assume, without deciding,. that if the offer of services by Mannes and the acceptance by Glaser had been before Mannes was licensed that under the express terms of the statute, Mannes could not recover. *Goldsmith v. Mfgrs' Liability I. Co.,* 132 Md. 283. See the cases collected in 30 *A. L. R.* beginning at page 855, those in 42 *A. L. R.* at page 1229, and those in 118 *A. L. R.* at page 647. Again we assume, without so deciding, that the provisions of Code, 1951, Art. 56, Secs. 219-239, which comprise the sub-title "Real Estate Brokers", are for the protection of the public and not merely revenue measures and, therefore, that if Mannes were unlicensed at the critical time, his employer, Shostack, the principal, could not recover on the contract made for him by Mannes, his unlicensed agent. It has been so decided. See *Haas v. Greenwald* (Cal.), 237 P. 38; *Firpo v. Murphy* (Dist. Ct. App. 1st Dist. Cal.), 236 P. 968; *Meyers v. Suffin,* 203 N. Y. S. 103.

We think the provisions of the sub-title "Real Estate Brokers" do not encompass the activities or rights of one who sells a business comprised of goodwill and personal property, and not real estate or an interest in real estate. The evidence in the instant case shows that there were discussions as to a lease for the premises which housed the tavern between Sandler and Milton Glaser at a time when Mannes was present, but that Mannes' contract was only to sell the tavern business as such and not to procure the lease. No assignment of an existing lease was involved in the transaction. Indeed, the property in which the tavern was located was not owned by Milton and Doris Glaser but by the latter and her brothers, who were never in the picture as far as the parties to this case are concerned. We think that Mannes' promises under his agreement, and his activities, did not bring him within the scope of the statute so as to require him to be licensed to do what he agreed to do, and did do, for the Glasers, that is, find a purchaser for the tavern, its goodwill, fixtures, equipment and stock. A number of decisions

confirm this view. See *Weingast v. Rialto Pastry Shop* (N. Y.), 152 N. E. 693; *James v. Alderton Dock Yards,* 231 N. Y. S. 215; *Claggett v. Am. Bowling & Billiard Corp.,* 48 N. Y. S. 2d 856; *Pike v. Psihogios* (Dist. Ct. App. 2nd Dist. Cal.), 228 P. 722; *Vander Sluys v. Finfrock* (La.), 103 So. 730; *Salisbury v. Alskog* (Wash.), 256 P. 1030; *Ireland v. Tomahawk Light, Telephone & Improvement Co.* (Wis.), 200 N. W. 642. Cases on the subject are collected in the annotation in 88 *A. L. R.* 1422. *Weil v. Lambert,* 183 Md. 233, which relied on *Kolb v. Burkhardt,* 148 Md. 539, 543, would seem to be in harmony with the principle underlying the decisions in the cases from other States cited above. See *Harlan v. Simering,* 163 Md. 609; and cf. *Schloss v. Davis,* 213 Md. 119.

The judgment below must be affirmed.

*Judgment affirmed, with costs.*