FRIER *v.* TERRY.

5-1684                                    323 S. W. 2d 415

Opinion delivered March 30, 1959.

[Rehearing denied May 18, 1959]

*Moses, McClellan & McDermott,* for appellant.

*Owens, McHaney, Lofton & McHaney,* for appellee.

ED. F. McFADDIN, Associate Justice.  This is an action brought by a business broker (G. W. Frier), claiming a commission for his alleged efforts in consummating a transaction.  From a judgment adverse to him, he brings this appeal.

Mr. Frier is a resident of Baton Rouge, Louisiana. Some time in November 1955 he called on Mr. Fred W. Terry, Sr. of the Terry Dairy Products Company, Inc. of Little Rock and Terryland of Forrest City (Inc.).  Both companies are hereinafter referred to as "Terry Corporations."  Mr. Frier claims that during that visit Mr. Terry agreed, on behalf of himself and each of the other stockholder-defendants of Terry Corporations, that Frier would be paid an agreed fee if a disposition could be made of the business and properties of the said Terry Corporations to the Borden Company.  On February 18, 1956 the stockholders of the Terry Corporations exchanged all of the common stock of said Terry Corporations for stock in the Borden Company.  Included also were certain real estate and leasehold interests owned individually by some of the stockholders of the Terry Corporations.  When all of the stockholder-defendants refused to pay Frier any commission, he filed this action, claiming that he was entitled to 2½% of the value of the

Terry Corporations stock exchanged, which would amount to approximately $29,000.00. The stockholders in the Terry Corporations[1] were Fred W. Terry, Sr., Mildred Terry Shea, Cornelia Terry, Ann Witsell Terry, and Fred Terry, Jr. As aforesaid, the judgment of the Circuit Court was adverse to Frier in all respects, and he brings this appeal, urging several points which we group and dispose of in convenient topic headings.

I. *Frier Insists There Was Error in Quashing The Service On Fred Terry, Jr.* Frier's original complaint was filed on March 23, 1956 and Fred W. Terry, Jr. was not named as a defendant at that time. Later he was added as a defendant, and service had on his mother in Pulaski County, Arkansas. There is nothing to show that this service on Fred W. Terry, Jr.'s mother was valid service: he filed no answer. On November 21, 1957, at the time of the trial, Fred W. Terry, Jr. was in the courtroom attending the trial as a witness, and he was then and there served with summons. The Court instantly quashed the service, reciting:

"It being shown to the Court that Fred Terry, Jr. is not a resident of this State, and further, that he was served with process in the Court Room, while appearing as a possible witness for the defendant in this matter, service on the said Fred Terry, Jr., is hereby quashed over the objections of the plaintiff."

The Court found that Fred W. Terry, Jr. was not a resident of Arkansas, so the service on his mother was not valid service on him; and when he was served with summons in the course of the trial, he was there as a witness under subpoena and was immune from service. See § 28-521 Ark. Stats. We find no error in this ruling.

II. *Instructed Verdicts In Favor Of Certain Defendants.* Frier claims that the Trial Court committed error in instructing the jury to return verdicts in favor of each of the following five defendants, to-wit:

[1] Mrs. H. T. (Will) Terry was also named as a defendant, although she owned no stock in the Terry Corporations. An instructed verdict was directed in her favor.

(1) Mrs. H. T. (Will) Terry; (2) Mildred Terry Shea; (3) Cornelia Witsell Terry; (4) Ann Witsell Terry; and (5) Fred W. Terry, Trustee: thus leaving as the sole defendant, Fred W. Terry, Sr.

(1)  As regards Mrs. H. T. (Will) Terry: it is clearly shown that she was never a stockholder in the Terry Corporations; so she could not be liable for the sale of her properties, which were not even alleged to be covered by the supposed contract between Fred W. Terry, Sr. and Frier.

(2)  As regards Mildred Terry Shea: she admitted that before the Borden-Terry transaction was consummated, she read or heard that Mr. Frier was attempting to act for her in the disposition of her stock; and that she discussed it with her brother, Fred W. Terry, Sr. While this evidence is slight, it is sufficient to submit to the jury the question of whether or not she authorized or ratified the alleged contract between Fred W. Terry, Sr., and Frier; and we think her liability should have been submitted to the jury.

(3)  As regards Cornelia Witsell Terry: the testimony fails to show that she ever heard of Mr. Frier[2] or his claimed contract until much later, so there was no error in directing a verdict for her.

(4)  As regards Ann Witsell Terry: we are unable to find any evidence in the record that indicates that she personally authorized or ratified anything, so we find no error in directing a verdict as to her personally. If she was a minor at the time of the alleged contract with Frier, and if Fred W. Terry, Sr. was acting as Trustee for her interest, then her interest would be liable if Fred W. Terry, Trustee, is liable.

[2] Here is her testimony:
"A.  I don't recall Mr. Terry mentioning the name of Mr. Frier. He probably did. I don't remember. He told me someone was interested in purchasing Terry Dairy Products Company.
Q.  You don't recall having heard anything about anybody attempting to act as agent for the stockholders in negotiating the sale?
A.  No.
Q.  When did you first hear anything about that?
A.  It was sometime after we started negotiations with Borden Company."

(5) As regards Fred W. Terry, Trustee: he, of course, knew, as Trustee, what he knew as an individual. He had authority, as Trustee, to authorize himself to act, or to ratify his actions. So the instructed verdict in favor of Fred W. Terry, Trustee, should not have been given.

III. *Frier Claims Errors In The Instructions As Regards Fred W. Terry, Individually.* Mr. Frier testified that he was a *business broker*; that he called on Fred W. Terry and asked him if he represented the stockholders of the Terry Corporations; that Terry said he did; and then Frier stated:

"Well, he said as President of the Corporation he was negotiating a deal and didn't want to discontinue these negotiations. I said, 'Fred, that is OK probably working on two deals would be better than one' and he agreed with me. I also stated as a business broker I worked on a percentage basis, the fee to be paid by the seller and in this case it would be 2½% of the gross sales less inventory, accounts receivables and cash; that it was customary to figure out the price you want for the business and to that price add my fee of 2½%, which would be the total asking price for the business. He said he understood that. At that time, I stated that my prospect would be The Borden Company; that my contact would be with the President, Mr. Ben Putnam of Borden Company. I stated that Borden made different types of deals, cash deals, exchange of stock, lease deals or combination of those deals and Mr. Terry said the type of deal he wanted was a stock exchange deal. I asked Fred if it would be all right for me under those conditions for me to call Mr. Ben Putnam stating that he wanted to sell his business and that he had rather have a stock exchange deal and he said 'under those conditions go ahead and call Mr. Putnam.' We visited for a few minutes and I left the office.

"Q. Are you telling that jury that Mr. Terry definitely agreed you would be paid a commission if you procured a buyer?

"A. He did."

Frier's testimony made a case for the jury, if Frier could legally collect a commission. He admitted that he had no *real estate broker's* license in Arkansas, as required by § 71-1301 *et seq.* Ark. Stats., but claimed that he needed no such license because he was selling the corporate stock and assets of the Terry Corporations; and that a broker who sells the stock and assets of a corporation is not a real estate broker. Terry insisted that Frier could not recover because he did not have a real estate broker's license. Frier requested these instructions:

"4. You are instructed that the Arkansas law did not require that Mr. Frier have a real estate license in the sale involved in this case.

"5. You are instructed that under the laws of Arkansas, the mere fact the corporation or corporations own buildings situated on realty did not necessitate the holding by Mr. Frier of a real estate license in order to claim a commission on the sale of corporate stock."

The Court refused Frier's instructions, and gave Terry's Instruction No. 5, which reads:

"The Plaintiff, by disclaiming any commission on the consideration received by the Defendant for the sale of real estate or an interest therein, cannot make an otherwise invalid contract valid, therefore, if you find that the Plaintiff originally undertook to find a buyer for any real estate or interest therein used in connection with Defendant's dairy operation, your verdict must be in favor of Defendant even though the plaintiff does not presently claim any commission thereon."

This brings us to the question, whether Frier, as a business broker, was required to have a real estate broker's license in Arkansas before he could legally collect a commission in this case. A broker is one who is engaged for others, on a commission, to negotiate contracts relative to property with the custody of which he has no concern.[3] The cases recognize that there are many kinds

---

[3] We have copied the definition found in 12 C.J.S. 5. Somewhat similar definitions may be found in 8 Am. Jur. 989 and Black's Law Dictionary.

of brokers, according to the particular class of transactions involved, such as real estate brokers, stock brokers, business brokers, insurance brokers, etc. The Arkansas statutory provisions relied on by the appellee herein are §§ 71-1301 *et seq.* Ark. Stats. But these statutory provisions relate only to *real estate brokers*, and not to stock brokers, business brokers, and other kinds of brokers; and our statute (§ 71-1302) defines a real estate broker as: ". . . any person . . . who, for a compensation . . . sells or offers for sale, . . . or negotiate the purchase or sale or exchange of real estate, or who leases or offers to lease . . . leases or royalties of whatsoever character, or rents or offers to rent, any real estate or negotiates leases thereof . . . for others, as a whole or partial vocation."

The Arkansas statute[4] does not purport to cover anything except real estate brokers. Does Mr. Frier come within the purview of the Arkansas statute regulating *real estate brokers?* It is clear that he was not selling real estate, as such: he was selling the business of the Terry Corporations. Stock in the Terry Corporations was exchanged for stock in the Borden Company. The only real estate sold was that owned by the individual stockholders; and as to that, Mr. Frier claimed no contract or commission. So we conclude that as a business broker Mr. Frier was not engaged in the sale of real estate; and the Court erred in giving its Instruction No. 5, which has been previously copied. Rather, the Court should have given the plaintiff's Instructions Nos. 4 and 5, as previously copied.

In 8 Am. Jur. 996 "Brokers" § 12, real estate brokers statutes similar to ours are discussed, and the

---

[4] The Arkansas statute is Act 148 of 1929. The Supreme Court of Michigan had decided in 1923 the case of *Miller* v. *Stevens*, 195 N. W. 481, in which was involved a Michigan statute which regulated not only real estate brokers, but "business chance brokers". Since the definition of real estate broker in the Arkansas statute is very similar to the Michigan statute, and since "business chance brokers" are not within the purview of the Arkansas statute, we are driven to the conclusion that it was not the purpose of the Arkansas statute to regulate any form of brokers except real estate brokers. The cases hold that statutes regulating brokers are in derogation of the common law and must be strictly construed and cannot be extended by implication. 12 C.J.S. 14.

text states: "Under such a statute there is strong support for the view that one engaged in buying or selling businesses as going concerns, . . . is not a real estate broker within the meaning thereof." In 88 A. L. R. 1422 there is an annotation entitled: "Necessity for real estate broker's license as affected by fact that sale is of both real and personal property"; and in that annotation are collected many cases involving the case of a business broker, as such. We particularly mention three cases: (1) *Dubin* v. *Mohn*, 247 Wis. 520, 19 N. W. 2d 880 (decided in 1945), wherein the Court said that a contract for the sale of corporate stock was not a contract for the sale of real estate; (2) *Weingast* v. *Rialto,* 243 N. Y. 113, 152 N. E. 693, wherein the Court of Appeals of New York held that a business broker who bought and sold businesses and goodwill was not a real estate broker; and (3) *Glaser* v. *Shostack,* 213 Md. 383, 131 A. 2d 724. In this case, the Maryland Court said:

"We think the provisions of the sub-title 'Real Estate Brokers' do not encompass the activities or rights of one who sells a business comprised of goodwill and personal property, and not real estate or an interest in real estate. The evidence in the instant case shows that there were discussions as to a lease for the premises which housed the tavern between Sandler and Milton Glaser at a time when Mannes was present, but that Mannes' contract was only to sell the tavern business as such and not to procure the lease. No assignment of an existing lease was involved in the transaction. Indeed, the property in which the tavern was located was not owned by Milton and Doris Glaser but by the latter and her brothers, who were never in the picture as far as the parties to this case are concerned. We think that Mannes' promises under his agreement, and his activities, did not bring him within the scope of the statute so as to require him to be licensed to do what he agreed to do, and did do, for the Glasers, that is, find a purchaser for the tavern, its goodwill, fixtures, equipment and stock. A number of decisions confirm this view. See *Weingast* v. *Rialto Pastry Shop,* 243 N. Y. 113, 152 N. E. 693; *James* v. *Al-*

*derton Dock Yards,* 225 App. Div. 675, 231 N. Y. S. 215; *Claggett* v. *American Bowling & Billiard Corp.,* Sup. 48 N. Y. S. 2d 856; *Pike* v. *Psihogios,* 68 Cal. App. 145, 228 P. 722; *Vander Sluys* v. *Finfrock,* 158 La. 175, 103 So. 730; *Salisbury* v. *Alskog,* 144 Wash. 88, 256 P. 1030; *Ireland* v. *Tomahawk Light, Telephone & Improvement Co.,* 185 Wis. 148, 200 N. W. 642. Cases on the subject are collected in the annotation in 88 A. L. R. 1422.''

For the reasons herein stated, the judgment is reversed to the extent stated, and the cause is remanded for further proceedings not inconsistent with this opinion.

JOHNSON, J., not participating.