Federated Petroleum Services, Inc., an Illinois Corporation, and Alan G. Schwartz, Plaintiffs-Appellants, v. Evelyn Daniels and J. I. Watson, Executor of the Estate of Charles J. Daniels, Deceased, Defendants-Appellees.

Gen. No. 49,632.

First District, Fourth Division.
February 3, 1965.
Rehearing denied March 11, 1965.

Crowley, Sprecher, Barrett & Karaba, of Chicago (Edward W. Barrett and Robert A. Sprecher, of counsel), for appellants.

James H. O'Brien and James O. Brooks, of Chicago, for appellees.

MR. JUSTICE DRUCKER delivered the opinion of the court.

This is an appeal by plaintiffs after a bench trial from a judgment entered in favor of defendants and against plaintiffs.

Plaintiffs' major contention is that the trial court erred in denying to them a commission of $31,542.86 arising out of the sale of defendants' business. Federated maintains that it had an exclusive agency or exclusive listing; that this arrangement permits an owner to sell his business but requires the owner to pay the agreed upon commission if the broker was the procuring cause of the sale.

Defendants owned the Daniels Oil Company which had a bulk plant and general offices in Downers Grove, Illinois, and engaged in the fuel oil business at six service stations in northern Illinois. During the pendency of this action defendant, Charles J. Daniels, died and on June 28, 1960, J. I. Watson, executor of his estate, was substituted as a party defendant.

Defendants first evidenced a desire to sell their business in 1952. Evelyn Daniels testified that in 1952 or 1953 the property was listed with the former em-

ployer of Mel Putnam, now president of plaintiff Federated; that there had been discussions with Russell Havens, sales supervisor of Bulk Petroleum, about selling defendants' business to Bulk. Sol Hoffman, a director of Bulk Petroleum, testified that he had two meetings with the defendants in Chicago in 1955 and that there was "a general discussion about the purchase by Bulk Petroleum Corporation of the business of the Daniels Oil Company . . ."; that in February 1956, "there were no pending negotiations between Bulk Petroleum Corporation and . . . (the) Daniels-(es) . . . with relation to the purchase of their property."

Putnam [1] testified that as the result of a conversation with defendants in Downers Grove, Illinois, in late September, 1955, "Mr. Daniels said he would list the property with Federated Petroleum Services. I asked that an exclusive listing agreement be signed and Mr. Daniels and Mrs. Daniels said they would agree to it." Putnam met with the Danielses twice in October.

On January 7, 1956, a written agreement was entered into between the Danielses and Federated. Its pertinent provisions were:

> The Daniels hereby appoint Federated their exclusive agent for the sale of all of the outstanding stock of the Corporation, and the improved land, buildings and equipment which is leased by The Daniels to the Corporation.
>
> . . . . . .
>
> The term of this agreement shall be from January 1, 1956, to June 30, 1956.
>
> . . . . . .

[1] He was licensed as a real estate broker in Illinois, Minnesota and Wisconsin as of July 26, 1955.

> The Daniels agree that during the period of this agreement they will not sell or otherwise dispose of any of the shares of the Corporation or any other property which is the subject of this agreement.

The commission was to be $30,000, with a provision for adjustment if the sale price deviated from $525,000.

Putnam testified as to the role that Federated assumed in merchandising defendants' complex:

> After this last conversation in October 1955, I advertised the Daniels Oil Company property in the Wall Street Journal, the Chicago Tribune, the National Petroleum news at various times and proceeded to compile the accounting information which Mr. Hickman [2] had secured. I had taken pictures of the properties and I prepared a brochure to promote the sale of this petroleum business. The financial information was placed in the back part of the brochure and the pictures in the front.

The twenty page prospectus, admitted into evidence, contained extensive information about the physical assets and financial status of the Daniels company; it described the bulk plant and the service stations and set out in detail the equipment and gallonage of gasoline sold at each site. Putnam further stated that he distributed about fifteen copies of the prospectus on January 1, 1956; that he updated the brochure and redistributed it early in 1956; that he sent a copy to the Danielses on February 8, 1956.

Plaintiff Alan G. Schwartz testified that he first became acquainted with Federated in the latter part

---

[2] An employee of Federated.

239

of 1955 as a result of its advertisement of the Daniels property in the Wall Street Journal; that he wrote Federated for further information and that about February 3, 1956, he received the detailed information sheet on the Daniels Oil Corporation as well as a transmittal letter; that he added a note to the letter and on February 14, 1956, directed it to Sol A. Hoffman, Bulk Petroleum's vice-president, for referral to the company's president, Joseph L. Stone. Schwartz further testified that he spoke to Mr. Hoffman on the telephone "several days after February 14, 1956," and that:

> I said to Mr. Hoffman, "Did you send this prospectus to Mr. Stone? did you send on the prospectus and the Federated Petroleum letter to Mr. Stone?" and Mr. Hoffman answered "Yes, I did send it to Mr. Stone."

Schwartz and Hoffman had several conversations about defendants' company between March and December, 1956. Schwartz further testified that he received another information sheet from Federated which complemented figures already furnished; that he sent these to Hoffman; that a conversation between Schwartz and Hoffman around the last part of March or the first part of April revealed that "Bulk and Daniels were negotiating"; that a conversation with Hoffman the end of May disclosed "it looked like there would be a deal. . . ." Schwartz stated that he advised Federated some time around September 20, 1956, of Bulk Petroleum's interest in the Danielses' business.

Sol A. Hoffman testified that he was counsel for Bulk for twenty years and an officer and director as well; that he was "told generally about everything that was going on"; that he had received correspondence from Schwartz about Daniels Oil Company in the mid-

240

dle of February, 1956; that he added a note, "Joe, please call me," to Schwartz's communication of February 14, 1956, and mailed it to Stone. More importantly, Hoffman stated that as of that date "there were no pending negotiations between Bulk Petroleum Corporation and . . . (the) Danielses with relation to the purchase of their property." During his testimony, Hoffman stated that "[T]he negotiations commenced in March or April of 1956 and continued on for several months resulting in a contract for the sale of the property, sale and purchase"; that the figures contained in the prospectus "formed the basis for a revival of interest in the acquisition of properties . . ."; that in the spring of 1956 he met with Mr. Daniels; that he told him that the information had been presented to Bulk by Schwartz; that "some consideration should be given to Federated in connection with this sale"; that Mr. Daniels stated that he had an arrangement with Federated but that he was not concerned about them because the deal would not be closed until after the exclusive contract had lapsed; that he (Daniels) had been dealing with Bulk before he had made the (present) arrangements. Hoffman also testified that the decision or agreement "to purchase in principle was agreed—was made—finally made in May of 1956"; that he started to draft the documents in July; that the transaction was finally completed in the office of a Naperville attorney on December 1, 1956; that the total purchase price was $552,000 and that the reason for the protracted delay in closing the transaction was:

It would be physically impossible to close this deal short of a couple months because of the question of titles and various other things and seasonal problems of the business, things of that such which ordinarily would have delayed the deal anyhow until the Fall of the year.

241

Defendants introduced only two witnesses in their behalf.

The testimony of Evelyn Daniels clearly indicated that she played no role in the negotiations which resulted in the sale to Bulk Petroleum.

Defendants' other witness, Russell Havens, a sales supervisor for Bulk Petroleum Corporation, testified that he had known the Danielses socially since 1939. His limited responsibilities relating to Bulk's acquisition of the Daniels Oil Company is revealed in his testimony:

> For the period 1955 to the end of 1956 I was performing my duties under the supervision and direction of Mr. Stone. In this period we were seeking new stations and it would be my duty to take Mr. Stone out to see the new stations. At this time I did not directly have anything to do with the financial matters of Bulk Petroleum. I had nothing to do with the cash position of Bulk Petroleum Company in regard to its ability to acquire the new stations. This was all left to Mr. Stone. . . .
>
> Mr. Hoffman was an officer of Bulk Petroleum Company. I knew Mr. Hoffman from the time I started with Bulk. He is the vice president and a director. I am not an officer nor a director of Bulk Petroleum Company.
>
> In the negotiations for new acquisitions by Bulk Petroleum Corporation, I bring the deal to the Company with the principals involved. . . . I bring the opportunities to the company and from then on the negotiations or the mechanics are carried on by Mr. Stone. I am usually included in it.

242

He further testified that from 1952 through 1956 he furnished profit and loss statements, balance sheets and gallonage figures about the Daniels company to the president of Bulk Petroleum, Mr. Stone (who was not called as a witness in this case). It is apparent from an examination of Havens' testimony that he did not bring the prospective purchaser to the Danielses. More importantly, he stated:

> Mr. Hoffman was present when we brought Mr. and Mrs. Daniels to his office in the fall of 1956. I do not recall having any discussions with Mr. Hoffman prior to this. *I do not recall being present at discussions that Mr. Hoffman had with Mr. Stone in that period on the subject of the Daniels' property.* (Emphasis supplied.)

Federated urges that it is entitled to the commission because its efforts were the "procuring cause" of the sale. It argues that although Bulk Petroleum and defendants did not sign the contract of sale until December 1, 1956, five months after the exclusive agency to sell had expired, Federated is not precluded from recovering its commission as broker. This view is upheld in Griswold v. Pierce, 86 Ill App 406, 407. There the owner wrote the broker that "he could have one more week in which to make the sale, but no more." Within the week the broker brought a prospective purchaser and another broker to the owner. The purchase was effected nine days after the expiration of the one week limitation. Although the broker was not present when the deal was closed, the court held:

> Appellee must be regarded as furnishing a purchaser ready, willing, and able to buy. He was, therefore, entitled to compensation, and the fact

that he did not bring the parties to terms within the time limit fixed by the letter of March 7th, does not defeat his right to recover. (Citing cases.)

The terminology in regard to "furnishing a purchaser" has varied in Illinois decisions. A broker has been held entitled to a commission when he was the "procuring cause of the sale," the "proximate cause of the sale," when he has "procured a buyer ready, able and willing to purchase on terms proposed by the owner," and when he has "presented to his employer a purchaser who enters into a valid, binding and enforceable contract with his employer." "Real Estate Brokers: The Procuring Cause," 41 Chicago-Kent Law Review 58.

The issue of "procuring cause" can be viewed from at least three vantage points: (1) bringing the parties together, (2) conducting negotiations and (3) supplying information.[3]

In Cowan v. Day, 156 Ill App 105, the court held that evidence that a friend of the broker, at the behest of the broker, informed the ultimate purchaser that the property was for sale was sufficient ground upon which to find that the broker was the procuring cause of the sale. The court said at page 107:

> Although he did not personally introduce Mrs. Kane to the defendant or show her the property, or even communicate with her in person, she was induced to apply to the defendant through the instrumentality of the plaintiff.

In Glass v. Liberty Nat. Bank of Chicago, 326 Ill App 251, 61 NE2d 167, the broker, one of many with whom the property was listed, sent to the attorney for the ultimate purchaser, at the attorney's request, a detailed

---

[3] "Real Estate Brokers: The Procuring Cause," supra, pp 59–63.

written statement about the property.[4] Within a short period the attorney's client purchased the property. The broker was allowed his commission although he did not (1) contact the purchaser before the sale, (2) introduce the parties nor (3) play a role in the negotiations. The court stressed the importance of the information sheet:

> . . . the information furnished to Fein (the attorney) was so complete and detailed that except for verification of the figures and an examination of the premises, an intelligent opinion could be formed by a prospective purchaser as to whether or not the property should be purchased . . . .
>
> . . . . . .
>
> It is difficult to believe that Rouske would have purchased the property after only a cursory examination of the exterior of the building, upon such short notice, without the detailed information that an intelligent purchaser would ordinarily require. It is clear that all the necessary information in great detail had been submitted to Fein, and whether or not Rouske was aware of the fact that Fein had received the information from Glass (the broker), it would be naive to assume that Fein did not use the details of Glass's submission in advising Rouske about such details as he undoubtedly needed before making a decision to purchase.

The facts of this case suggest a hybrid of "bringing the parties together" and "supplying information."

In construing the actions of the late Charles J. Daniels, we must consider the letter of August 4, 1956,

---

[4] The information included data as to the condition of the building, its income, expenses, taxes, improvements and financial structure.

sent by him slightly more than a month after the exclusive agency to sell had expired. He wrote Federated requesting a release and asserting that:

> We have a proposed sale in the making. However the prospect is not one furnished by you and in our talks, we mentioned the fact that we had this business listed for sale by you. This prospect would like a release by you, so that there would be no possibility of litigation after the sale.
>
> The prospect we have been negotiating with is the Bulk Petroleum Co., 2958 No. Ashland Ave., Chicago, Ill. who you will remember we have been talking to for the past five years. We are not getting anywhere close to the amount we were asking, but because of the recent upheaval in the sale of all the independent stations in Chicago, we thought it best to sell and get out.

The contents of this letter deviated from the actual facts in that the agreement with Bulk Petroleum Corporation had already been reached in May, 1956, and the sale price was $552,000, according to Federated's computation, $27,000 more than the price set forth in the listing agreement.

Another consideration is a letter on Federated stationery dated May 24, 1956 (more than a month before expiration of the exclusive agency agreement) from its employee Hickman, sent to Daniels by certified mail inquiring:

> . . . if you have succeeded in securing a purchaser. If you have, I will let Mel know and we can stop any further expense and effort on our part and concentrate working with you in order to get a sale consummated.

> I really do not believe this has happened, because I feel sure you would have told us before this knowing how much time and money we have already expended in behalf of your property.

Mr. Daniels did not reply to the correspondence.[5]

■ The evidence clearly discloses that Federated was the procuring cause of the sale. It was instrumental in supplying extensive information about the seller's business to the prospective purchaser. The work of Federated, with the help of Schwartz, resulted in a successful consummation of a goal to which the Danielses unsuccessfully aspired for three years: the sale of their petroleum business. Since it is apparent from the evidence that the agreement to purchase was reached in May, 1956, we conclude that the provision of the exclusive agency contract requiring Federated to submit to the defendants a list of prospects has no bearing on the outcome of this case.[6]

Defendants contend that Federated was not entitled to be paid a brokerage commission because the conduct and activities of Hickman, a vice-president of Federated, violated the statute which requires that every member or officer of a business enterprise who "active-

---

[5] The letter, introduced as defendants' exhibit 2, making inquiry as to a rumor regarding a possible sale to an oil company, was not in our opinion an act which brought Hickman within the ambit of the statute requiring him to have a license as a real estate broker. (Ill Rev Stats 1955, c 114½, §§ 1, 2, 2a.) The letter stated that Hickman would notify Mel Putnam so that Federated would terminate its efforts in locating a purchaser. This is an affirmation of the fact that Hickman was performing work at the direction of Putnam.

[6] Putnam testified that on July 5, 1956, he sent a letter (Plaintiff's Exhibit 24) to defendants listing the prospects Federated had contacted. Alan G. Schwartz was on the list. Bulk Petroleum was not listed.

247

ly participates in the brokerage business" must hold a certificate of registration as a real estate broker. (Ill Rev Stats 1955, c 114½ §§ 1, 2, 2a.) Plaintiff's officers were Mel Putnam, president; Holme Hickman, vice-president and secretary-treasurer; and John T. Ennis, a vice-president and attorney.[7] Only Putnam possessed an Illinois real estate broker certificate of registration. Defendants argue that Hickman's participation in the arrangements surrounding the sale of defendant's business constituted active participation in the brokerage business within the ambit of the statute.

Hickman testified that:

> The duties I perform for the plaintiff . . . : I prepare tax returns and keep the books and records for Federated Petroleum Services, their income and expense records; I also at the request of Mr. Putnam, performed audits on various oil jobbers and propane gas jobbers in the midwest area. I was performing these same duties for the period August, 1955 through 1956.

He further testified that he met defendants in October, 1955, at which time he consulted with their bookkeeper in order "to prepare the accounting figures that Mr. Putnam requested that I prepare"; that he was instructed by Putnam to meet with defendants to sign the listing agreement with them after making sure

---

[7] Putnam testified that advertising, brochures and the general conduct of the brokerage business was conducted by him from Federated's principal office and place of business in Madison, Wisconsin; Hickman worked out of Federated's accounting office in Hannibal, Missouri. Ennis testified: "The registered office and registered agent of the plaintiff, Federated Petroleum Services, Inc. was my law office in Quincy, Illinois. . . . The corporation did not that I can recall carry out any business activity from the registered office in Quincy, Illinois."

248

that the provisions of the contract conformed with Putnam's prescriptions.

Hickman's uncontroverted testimony was:

> I also told him [attorney for defendants] that Mr. Putnam told me the various items that were supposed to be in the contract and I told the attorney if he didn't object, that I would like to review the contract, in order to make certain that the various provisions Mr. Putnam told me should be there were there; and as a consequence I asked the attorney if I could have the contract and I could review it. After I read the contract, I told the attorney that the contract apparently was all right with one exception, that there was one clause that Mr. Putnam told me was quite vital to any type of listing agreement that should be there and I felt that I would be derelict in my responsibilities to Mr. Putnam and the corporation if I didn't do what he told me to do and I told him I wanted this last paragraph here, inserted on the contract.

He further stated that he arranged to have the clause appended; that he met with defendants on January 7, 1956, at a restaurant near Chicago's Midway Airport and that both parties to the agreement signed the contract. On cross-examination the accountant said that Mr. Putnam prepared the prospectuses for plaintiff; that Hickman's only contribution to the brochure was to "prepare accounting data"; that he was not the author of the insertion in the contract, rather, he was "given the draft of this paragraph by Mr. Putnam"; that he did not spend any considerable time on the premises of Daniels Oil Company gathering material that ultimately went into the prospectus but that he "spent . . . time at their bookkeeping office."

249

Putnam, Hickman's superior, classified Hickman's work:

> He is a CPA. Mr. Hickman handles all the internal financing of the company as it relates to his secretary-treasurer position. Under my direction he performs audit work in connection with the financial situation of a petroleum business that I would have listed for sale. . . . [He] performed no other services or duties for Federated Petroleum Services, Inc.

Putnam testified that he, not Hickman, performed the following: securing of listings and leases, preparing of prospectuses, securing of prospective buyers and the listings for sale.

The testimony of Federated's counsel, John Ennis, confirmed the assertions of Putnam and Hickman: Hickman's work was confined to that of finance and accounting.

Plaintiffs' cases, Charles Ford & Associates of Midwest, Inc. v. Goldberg, 7 Ill App2d 241, 129 NE2d 337; Frier v. Terry, 230 Ark 302, 323 SW2d 415, and defendants' citations, Lyons v. Schanbacher, 316 Ill 569, 147 NE 440; Pascal P. Paddock, Inc. v. Glennon, 45 Ill App2d 362, 196 NE2d 385; and Ford, supra, are not helpful because they do not construe the statutory language ". . . actively participates in the brokerage business . . ."

██ A real estate broker is identified in Section 2 (Ill Rev Stats 1955, c 114½, § 2) as one:

> . . . who for a compensation or valuable consideration sells or offers for sale, buys or offers to buy, or negotiates the purchase or sale or exchange of real estate, or who leases, or offers to lease, or rents or offers for rent, any real estate, or negotiates leases thereof, or of the improvements thereon for another or others.

Hickman's activity was not that of selling, buying, leasing, renting or negotiating various facets of the real estate transaction. His work for Federated was supplementary and complementary to that of plaintiff's president, Putnam. Hickman was responsible for assembling, assimilating and correlating the diverse financial and accounting information about petroleum clients. The material which he collected was incorporated in the brochure which Putnam originated and distributed. Hickman's contacts with defendants were necessary only for the purpose of acquiring financial information.[8] The testimony indicated that much of Hickman's time spent with defendants was actually spent in consultation with their accountant. We do not believe that an individual, affiliated with a real estate broker, who is responsible for assembling financial and accounting data for the broker ". . . actively participates in the brokerage business of such association . . ." (Ill Rev Stats 1955, c 114½, § 1).

Defendants insist that the signing of the listing agreement by Hickman on behalf of Federated constituted "active participation." From the evidence, we believe it was the consummation of the extensive work performed by Putnam in producing the prospectus for defendants' enterprise. Hickman was told what to look for and what specific changes were to be made. Hickman, in this capacity, was not actively participating in the brokerage business and was not required to have a certificate of registration.

Defendants assert that one of the plaintiffs, Alan G. Schwartz, was required to be licensed as a real

[8] It is important to note that businesses and certain professions must rely on the work of "unlicensed" people. For example, many a doctor cannot adequately treat his patient without the information gathered by the receptionist and technician. A similar problem occurs in the legal profession where investigators and clerks are needed to assist their employers in certain facets of their work. Cf. People v. Alexander, 53 Ill App2d 299, 202 NE2d 841.

estate broker pursuant to the Municipal Code of Chicago, c 113–1, et seq.[9] Defendants maintain that Schwartz was so inextricably interwoven in the "chain of circumstances" that because of his failure to obtain a City license, neither Schwartz nor Federated could recover the commission under the contract entered into with defendant.

■ This hypothesis fails to confront several salient aspects of Schwartz's relationships with both Federated and defendants. Initially, Schwartz was not suing to recover a commission for himself, rather he was involved with Federated in an attempt to help them secure their commission. More importantly, Schwartz was *not* a party to the contract between Federated and defendants.[10] We are aware that Schwartz played a role in the sale of defendants' business and that Federated agreed to share its commission with him. Schwartz purveyed the information he received from Federated to an officer and director of the purchaser.

Therefore, the status of Schwartz under the Municipal Code of Chicago was immaterial and irrelevant as far as defendants were concerned, and it does not and could not render void and unenforceable the contract sued on in this case since Federated under the circumstances of this case was not required to have a city license.[11] Schwartz was not employed by defendants as a broker; he never met the defendants; he took no part in negotiating the terms and conditions of the listing agreement; nor was he present at the negotia-

---

[9] On November 25, 1955, and thereafter during the period of time pertinent to this case, Schwartz was licensed as a real estate broker by the State of Illinois but was not licensed by the City of Chicago.

[10] Putnam, Federated's president, disclosed the contractual relationship: "I entered into an agreement with Alan G. Schwartz to pay him a half of any commission I receive."

[11] Federated's office was not located in Chicago.

tions between the defendants and the purchaser, Bulk Petroleum Company, which led to the eventual sale of the business by defendants to Bulk. The court's finding and judgment in favor of defendants on Schwartz's claim was proper.

We hold that the judgment in favor of defendants on the claim of Federated is contrary to the manifest weight of the evidence and that defendants became obligated to pay Federated a broker's commission by virtue of their written agreement, dated January 7, 1956.

The judgment in favor of defendants on the claim of Schwartz is affirmed. The judgment in favor of defendants on the claim of Federated is reversed and the cause is remanded for the purpose of entering judgment in favor of Federated for the amount of commission found to be due Federated under the contract of January 7, 1956.

Affirmed in part reversed in part and remanded with directions.

McCORMICK, P. J. and ENGLISH, J., concur.