646 P.2d 435

### CENTURY 21 QUALITY PROPERTIES, INC., an Idaho corporation, Plaintiff-Appellant,

v.

### Stephen L. CHANDLER, M. E. LaMarche, and Adolfo James Archabal, Jr., Defendants-Respondents.

No. 13799.

Court of Appeals of Idaho.

April 6, 1982.

Petition for Review Denied June 18, 1982.

194

Randall C. Fredricks of Clemons, Cosho & Humphrey, Boise, for plaintiff-appellant; Paul T. Baird, Boise, on the briefs.

Bruce H. Tompkins of Elam, Burke, Evans, Boyd & Koontz, Boise, for defendants-respondents; Merrily Munther, Boise, of the firm, on the briefs.

SWANSTROM, Judge.

Century 21 Quality Properties, Inc., a real estate broker, brought suit in the district court for a broker's commission claimed to have been earned as a result of a sale of property owned by respondents. The trial judge found there was no agreement by respondents to pay a commission on the sale, which occurred several months after the closing date set forth in an "earnest money agreement." We affirm.

The principal issue on appeal is whether the trial court erred in deciding that Century 21 was not entitled to the commission under the provisions of an "earnest money agreement" dated October 10, 1977. A threshold issue is whether that agreement complied with the requirements of I.C. § 9–508, the statute of frauds.

The facts essential to our opinion are as follows: Century 21 Quality Properties, Inc. and Chase Barbee are licensed real estate brokers. Barbee worked for Century 21 and was acting in its behalf during the transactions we discuss. Barbee had business dealings with one Craig Johnson. Barbee knew that Johnson and his partner, doing business as J & K Builders, Inc., wanted property to develop with an apartment complex. Barbee learned that respondents, Chandler, LaMarche and Archabal, owned a piece of property suitable for development. With knowledge of J & K's needs, Barbee approached one of the owners to determine if the property was for sale. Barbee sought a "listing" on the property from the owners, but the owners were unwilling to list the property with Century 21. Barbee was told the owners might consider a specific proposal.

Barbee made several contacts back and forth between J & K and the owners that led to the signing of an "earnest money agreement" in February, 1977, by the owners and J & K. The agreement provided for a sale of the property from owners to J & K by May 1, 1977, for $97,500 with a payment by owners of a six percent broker's commission upon closing. Barbee spent considerable time and effort to bring about a closing of the sale. He introduced Craig Johnson to certain lending officers, an architect, and planning and zoning officials, in trying to assist J & K with its planning and borrowing problems. However, J & K was unable to obtain financing for the project, and the sale did not close as provided in the February agreement.

Negotiations broke off between the owners and J & K. During the summer of 1977 the owners listed the property with a real estate broker other than Century 21 for a short period of time. Barbee attempted, unsuccessfully, to locate other property for J & K. However, in September, 1977, the owners' property was still available and Barbee renewed his negotiations with the owners for a sale to J & K. These negotiations led to the signing, by the owners and J & K, of another earnest money agreement dated October 10, 1977, for the sale of the same property, this time for $103,000. The final paragraph of this agreement was as follows:

SELLER ACCEPTS the foregoing terms and conditions and agrees to sell the above property to Buyer and to pay the Broker's commission <u>Five Thousand One Hundred Fifty</u> which the Broker shall have the right to retain from the proceeds of this sale. In the event the earnest money receipted for in connection with this sale is forfeited, Seller agrees that one half thereof shall be retained by the broker, provided the amount to the broker does not exceed the agreed upon commission due, and the balance shall be paid to the undersigned Seller.

[NOTE: The words underlined were written in on the printed form.]

Shortly after this agreement was signed, J & K abandoned its apartment complex plans in favor of a townhouse development, for financing and marketing reasons. Delays in obtaining financing approval for the new project prevented closing of this sale by January 15, 1978, the specified closing date. Barbee was told the owners would not extend the agreement.

After January 15, Barbee had no further part in negotiations between the owners and J & K. Barbee testified that Craig Johnson did not want to talk to him any more about it. On January 17, however, Johnson personally filled out a "real estate purchase and sale agreement" that he presented to the owners. This provided for sale of the same property to J & K for $103,000, giving credit to J & K for $2,000 earnest money already received by the owners from the previous agreements. The owners and J & K signed this new agreement, which expressly stated there was no broker's commission to be paid. Again the sale did not close by the closing date due to delays J & K encountered in obtaining financial approval. Successive agreements were executed between the owners and J & K. Between January and June of 1978, J & K made at least four payments of $811 each, which were applied against the underlying debt owing on the property. J & K

made these payments for the benefit of the owners, to keep the transaction going until the sale finally closed about June 14, 1978. There is no evidence that these payments were applied against the purchase price. J & K also paid $5,000 on March 24, $5,000 on April 2, and $10,000 on May 16, all of which payments were applied to the purchase price of $102,750 shown on the final agreement.

Century 21 claims that Barbee was instrumental in bringing the owners together in 1977, and that Century 21 is entitled to the $5,150 commission under the October, 1977, agreement signed by the owners and J & K. The owners contend that the October, 1977, agreement, upon which Century 21 relies for its commission, did not satisfy the requirements of I.C. § 9–508, the statute of frauds, because it was not signed by any representative of Century 21 until April, 1980, a week before the trial. Idaho Code § 9–508 requires real estate commission contracts to be in writing:

> No contract for the payment of any sum of money or thing of value, as and for a commission or reward for the finding or procuring by one person of a purchaser of real estate of another shall be valid unless the same shall be in writing, signed by the owner of such real estate, or his legal appointed and duly qualified representative.

The owners contend the agreement did not contain the basic elements of a broker's employment contract or listing agreement. The owners argue that a broker's employment contract is not a unilateral agreement which the broker may accept by full performance, and that the case of *C. Forsman Real Estate Company v. Hatch*, 97 Idaho 511, 547 P.2d 1116 (1976) requires the signatures of both the broker and the party seeking to obtain a purchaser.

■ Certain dictum in *Forsman* did state "that a brokerage contract required the signature *not only of the broker,* but also of the party seeking to obtain a purchaser." [Emphasis added] 97 Idaho at 515, 547 P.2d at 1120. However, *it is not necessary for us to determine how that language in *Forsman*

applies in this case. Neither the earnest money agreement dated February 2, 1977, nor the one dated October 10, 1977, is a "listing agreement" or a broker's employment contract. These agreements are nothing more than printed contract forms supplied by Century 21, filled in by Barbee, setting forth the terms and conditions under which the owners agreed to sell their property to J & K. Each contains a broker's payment clause.

■ Century 21 had the burden of proving there was a listing agreement or a broker's employment contract, either written or oral, and it failed to carry that burden. *Wilson v. Colburn*, 167 Kan. 381, 206 P.2d 1054 (1949); *Patee v. Moody*, 166 Kan. 198, 199 P.2d 798 (1948). The trial judge's finding that there was no written or oral listing agreement between owners and broker is supported by substantial and competent evidence. The court's finding will not be set aside. I.R.C.P. 52(a).

■ Absent a broker's employment contract or listing agreement meeting the requirements of I.C. § 9–508, a broker in Idaho may recover a commission only in exceptional circumstances. For example, in *Isaguirre v. Echevarria*, 96 Idaho 641, 534 P.2d 471 (1975) the court allowed a broker who was "orally engaged" by the owner to arrange for the sale of a ranch to recover a commission from the owner, where the owner and the purchaser, but not the broker, had signed a "receipt and agreement to purchase" that contained a provision for payment of the broker's commission by the owner. *Homefinders v. Lawrence*, 80 Idaho 543, 335 P.2d 893 (1959), also involved the oral employment of a broker followed by a written agreement between the owner and the purchaser wherein the owner acknowledged employment of the broker and agreed to pay the broker's fee.

In both *Isaguirre* and *Homefinders* the court recognized the brokers' claims were not dependent upon any contract meeting the requirements of I.C. § 9–508 obligating the owners to pay for a broker's services to be rendered in finding a purchaser. Rather, the brokers' claims in these cases were

predicated upon the written promises of the owners, made after rendition of those services, to pay the brokers for services rendered, evidenced by the type of clause we have quoted above.

These cases are illustrative of situations where the Idaho court has allowed brokers to recover commissions without a written employment contract or listing agreement. In this case, had the sale closed as specified in the October agreement, the owners would have been obligated to pay Century 21 the $5,150 commission.

However, facts present in *Isaguirre* and *Homefinders*, and not present here, distinguish those cases. First, in *Isaguirre* and *Homefinders* it is clear that the broker was employed (orally) by the sellers to find a buyer; that is not disputed in either case. In this case it is disputed as to whether Barbee was acting as agent for J & K or as agent for the owners. The evidence is equivocal. An agency relationship cannot be inferred from the bare fact that the owners agreed to pay a broker's commission if the sale closed as contemplated. *Norville v. Palant*, 25 Ariz.App. 606, 545 P.2d 454 (1976).

The trial judge made no specific finding as to whether Barbee was acting in this matter as the agent of the owners or as agent of J & K. His only finding in this regard was that "[n]either [Century 21], nor Chase Barbee, as its agent, had a listing on the real property, either oral or written." We have carefully examined the transcript of the trial for evidence relating to any agreement by owners to employ Century 21 as the agent of owners to procure a buyer for the owners' property. That evidence is lacking. The language of the October agreement, like the earlier agreement, is not persuasive that the owners employed Century 21 as owners' agent for any purpose other than for certain limited functions in connection with a sale that was to close by a specified date.

Second, the brokers in *Isaguirre* and *Homefinders* found a ready, willing, and able buyer to purchase on terms that were agreeable to sellers. The buyer here, J & K, was unable to perform within the time specified by the owners. We conclude that Century 21 cannot prevail under the *Isaguirre—Homefinders* line of authority.

Century 21 relies only in part upon the holdings of *Isaguirre* and *Homefinders*. The claim for a commission in this case takes us beyond the factual situations and the holdings of these two Idaho cases. Century 21 has relied upon several other cases from other states which generally support the proposition that a broker's right to a commission does not necessarily terminate if a sale is not completed within the time specified in the broker's contract of employment. *See, e.g.*, Annot., 27 A.L.R.2d 1348 (1953); *Mohamed v. Robbins*, 23 Ariz.App. 195, 531 P.2d 928 (1975); *Marmon v. Decker Realty & Insurance Co.*, 313 So.2d 132 (Fla. App.1975); *Arthur Rubloff & Company v. Comco Corporation*, 63 Ill.App.3d 362, 20 Ill.Dec. 338, 380 N.E.2d 15 (1978); *Federated Petroleum Services, Inc. v. Daniels*, 56 Ill.App.2d 236, 205 N.E.2d 741 (1965); *Hamberlin v. Bourgeois*, 289 So.2d 358 (La.App. 1973); *Kopka Real Estate, Inc. v. MacLeod*, 119 N.H. 547, 404 A.2d 298 (1979); and *Fry v. Doyle*, 167 N.J.Super. 486, 401 A.2d 265 (1979) *cert. denied*, 81 N.J. 287, 405 A.2d 831.

We have examined and compared each of these cases in light of the facts and circumstances of this case. With the exception of *Fry* and *Kopka Real Estate, Inc.* each of these cases dealt with a listing agreement or broker's employment contract. Two of the cases dealt with agreements which contained "protective clauses" that set forth the broker's right to recover a commission for a sale negotiated by the broker that closed after the listing agreement expired. In the *Kopka* case the sellers had signed an option agreement which recognized Kopka as the broker who had brought about the transaction. In *Fry* there was a written option agreement containing a commission addendum that the court said "did not contain any proviso that payment of the commission was contingent upon the production of a purchaser ready, willing and able to buy before the option expired." 401 A.2d

at 270. In none of the cited cases was it disputed that the broker had been employed by the owners to procure a purchaser or a lessee of the owners' property. While we acknowledge the existence of this line of authority, which permits a broker under certain circumstances to recover a commission earned during his employment even where the sale does not occur during the term of the agreement, we do not think the holdings in those cases are applicable to this case.

In *Marshall Bros., Inc. v. Geisler*, 99 Idaho 734, 588 P.2d 933 (1978), the Idaho Supreme Court stated the law in Idaho to be:

[I]f a broker who has contracted with a prospective seller to procure a ready, willing and able purchaser for the seller's real property presents a buyer ready, willing and able to buy on terms listed by the seller with the broker or on other terms which the seller accepts, *in the absence of special conditions in the broker's employment contract*, the broker is entitled to his commission. *Rogers v. Hendrix*, 92 Idaho 141, 144, 438 P.2d 653, 656 (1968); *Garfield v. Tindall*, 98 Idaho 841, 573 P.2d 966 (1978). [Emphasis added]

99 Idaho at 738, 588 P.2d at 937. We do not view the writing here as a "broker's employment contract." However, even if it were so viewed, we believe the circumstances of this case bring it within the "special conditions" exception to the general rule quoted from *Marshall Bros.* This special condition exception is explained in RESTATEMENT (SECOND) OF AGENCY § 446 (1958), as follows:

An agent whose compensation is conditional upon his performance of specified services or his accomplishment of a specified result within a specified time is not entitled to the agreed compensation unless he renders the services or achieves the result within such time, unless the principal in bad faith has prevented him from doing so.

Here the earnest money agreement stated the sale was to be closed "on or before 1/15/78" and "time is of the essence hereof." A partially typed and partially handwritten provision, inserted into the agreement, said: "earnest money in its entirety to be retained by sellers if sale is not consummated by 1/15/78." This provision contradicts the printed statement in the broker's payment clause that one-half of the earnest money would be retained by the broker in the event of a forfeiture. Century 21 has never disputed that the written and typed in provision was controlling and correctly expressed the intention of all of the parties. Finally, the last paragraph of the earnest money agreement, the broker payment clause, provided that "seller accepts *the foregoing terms and conditions* and agrees to sell the above property to buyer and to pay the broker's commission $5,150 which *the broker shall have the right* to retain from the proceeds of *this sale.*" (Emphasis added). These provisions, supplied by Barbee, can be reasonably construed to support the trial judge's finding that the earnest money agreement "did [no more] than provide that the commission would be paid if a particular described sale was completed." We believe these provisions are special conditions and thus fall within the exception to the general rule described in *Marshall Bros., supra. See also Wm. E. Doud & Co. v. Smith*, 256 Cal. App.2d 552, 64 Cal.Rptr. 222 (1967); *Williams v. United California Bank*, 223 Cal. App.2d 309, 35 Cal.Rptr. 788 (1964).

The trial court found that the delay of the sale beyond January 15, 1978, was not due to any fraudulent attempt by the owners and J & K to circumvent the payment of the broker's commission. The evidence indicates that the delay was caused by the buyers' inability to arrange or to obtain adequate financing. J & K was not able to purchase by January 15. Shortly after January 15, Craig Johnson of J & K resumed negotiations directly with the owners. While the negotiations between the owners and J & K continued uninterrupted, successive new agreements were signed by them, and it was necessary for J & K to pay additional consideration to the owners through a creditor of the owners, to keep

the negotiations going until J & K was able to close.

Our Supreme Court in *C. Forsman Real Estate Company v. Hatch*, 97 Idaho 511, 547 P.2d 1116 (1976) reminded the Idaho real estate community that:

> The primary purpose of I.C. § 9–508 is to prevent fraudulent or unfounded claims of brokers. This particular portion of our code relates entirely to statutes of frauds *and has as its objective avoiding disputes* as to whether or not an agreement in fact exists, the amount of a commission and the exclusive or non-exclusive terms of a listing agreement. [Emphasis added]

97 Idaho at 515, 547 P.2d at 1120. *See also Rexburg Realty, Inc. v. Compton*, 101 Idaho 466, 467, 616 P.2d 245, 246 (1980).

The fundamental purpose of I.C. § 9–508 is not served if the writing furnished by the broker and relied upon by him for his commission tends to create rather than dispel disputes. On such a writing as we have here, we cannot say the district court erred in denying the relief requested by Century 21.

The judgment is affirmed. Costs to respondents. No attorney fees on appeal.

WALTERS, C. J., and BURNETT, J., concur.