Harley J. HARBEN and wife, Tana Harben, Plaintiffs/Appellees,

v.

David W. HUTTON, Defendant/Appellant.

Court of Appeals of Tennessee, Middle Section.

Aug. 28, 1987.

Permission to Appeal Denied by Supreme Court Nov. 2, 1987.

William M. Leech, Jr., Nashville, for defendant/appellant.

Jack B. Henry, Pulaski, for plaintiffs/appellees.

## OPINION

KOCH, Judge.

This appeal involves a dispute concerning the sale of a one hundred-year-old Victorian house. The buyers, insisting that the extent of the house's renovations had been misrepresented, filed this action in the Chancery Court for Giles County after the seller refused to make the extensive repairs they demanded. They sought rescission of the contract or damages. Following a bench trial, the trial court awarded the buyers a $42,000 judgment. Both

the seller and the buyers have appealed. The buyers insist that the trial court should have rescinded the contract or, in the alternative, should have awarded more damages. The seller insists that the trial court erred by finding that the real estate agent who was involved in the sale of the house was acting as his agent in this transaction. He also insists that the trial court erred by failing to grant him a continuance after he discharged his first attorney. We have determined that the evidence preponderates against the trial court's finding that the real estate agent was representing the seller in this transaction. Therefore, we vacate the judgment and remand the case to the trial court with directions that it be dismissed.

## I.

Harley J. Harben, a Major in the United States Army, was transferred to the Redstone Arsenal in Huntsville, Alabama in early 1983. He and his wife decided to purchase a house near Huntsville because they planned to work for a defense contractor there after Major Harben retired from the service. Shortly after he reported for duty, Major Harben contacted a Pulaski real estate agent named Garfield Carvell to find out whether he knew of an old Victorian house that was for sale. Mr. Carvell told Major Harben that he did not have anything that met the Harbens' requirements but that he would check around and get back to him if he found something. Mr. Carvell mentioned Major Harben's telephone call to one of his employees, John Hutton, who told him that his brother, David W. Hutton, owned an old house that met the Harbens' requirements.

Mr. Carvell contacted Mr. Hutton to find out whether his house was for sale and, if it was, its asking price and the amount of land that came with it. Mr. Hutton told Mr. Carvell that he would sell the house for $140,000 and agreed to give Mr. Carvell the house key to show it. Mr. Hutton never asked Mr. Carvell to list the house or to represent him in any other fashion. He gave Mr. Carvell no information concerning the renovation he had made since he purchased it. After this conversation, Mr.

Carvell telephoned Major Harben and told him "I have a completely restored, old Victorian. I think it's what you want".

Major Harben and Mr. Carvell visited the house on July 29, 1983. This was the first time Mr. Carvell had ever been inside the house. He knew nothing about the house other than what he observed that day because Mr. Hutton had given him no specific information about the renovations that had already been done. Nevertheless, Mr. Carvell told Major Harben that Mr. Hutton had planned at one time to live in the house and had spent $175,000 renovating it in anticipation of moving in. He told Major Harben that the house had been completely restored, that it had a new metal roof that would last a lifetime, that it had been completely rewired, and that a new furnace, heat pumps, and kitchen appliances had been installed.

Mr. Carvell also informed Major Harben that Mr. Hutton had an assumable V.A. loan on the house and property. Major Harben assumed that all necessary repairs had been done because Mr. Hutton had been able to obtain a V.A. loan and asked Mr. Carvell to obtain a copy of the V.A. appraisal for him. Mr. Carvell agreed to do so and assured Major Harben that all the problems he had found in other houses had been taken care of in this house.

Mr. Carvell and Major Harben inspected every part of the house on July 29, 1983. Major Harben took extensive notes to send to his wife. He also asked Mr. Carvell to obtain information concerning property taxes, insurance, utility bills, schools, the completion of a nearby road, and the activity at a neighboring phosphate mine. Mr. Carvell agreed to get answers to these questions and within a few days sent Major Harben a packet of information.

Major Harben returned two days later with several of his children to look at the house. Mr. Carvell did not accompany them on this occasion. They walked the property but did not go into the house because they did not have a key.

The major visited the house for the third time on August 15, 1983. This time he was

accompanied by his wife and Mr. Carvell. Mr. Carvell showed Mrs. Harben the house and again told the Harbens that the house had been completely renovated, that it had new appliances, and that it would be thoroughly cleaned prior to the sale because it had been vacant for so long. He also emphasized the fact that the house had been approved for a V.A. loan which meant that all necessary repairs had been completed satisfactorily.

The Harbens returned to the house on August 16, 1983 without Mr. Carvell. They spent several hours looking at the house and property. That night they contacted Mr. Carvell at his home and told him that they had decided to buy the house. Mr. Carvell asked them to meet him at his office to prepare a contract to present to Mr. Hutton.

The Harbens and Mr. Carvell met at Mr. Carvell's office later that evening to discuss the terms of their offer to purchase the house. The Harbens told Mr. Carvell that they had found that a portion of the back porch had not been painted, that the railing on the front porch should be tightened, that a light fixture in the parlor was missing, and that one of the chimneys was in need of repair. Mr. Carvell asked them if these problems could be corrected for $1,000 and recommended that they offer $139,000 for the house instead of agreeing to the offering price and then insisting that these repairs be made before the sale was completed. The Harbens agreed.

Mr. Carvell used one of Carvell Realty Company's standard "Earnest Money Deposit Receipt and Agreement of Sale" forms to prepare the Harbens' offer. Mr. Carvell asked Mrs. Harben to fill in the essential terms because her handwriting was better than his. The contract they prepared provided that the Harbens would purchase the house and approximately ten acres of property from Mr. Hutton for $139,000. The Harbens agreed to make a $4,000 down payment and to assume Mr. Hutton's existing V.A. loan in the approximate amount of $135,000. Mr. Carvell also asked Mrs. Harben to include a provision obligating Mr. Hutton to pay Mr. Carvell a

six percent commission. They also included a provision requiring Mr. Hutton to leave the refrigerator in the house. The agreement also provided that the transaction would be closed on September 1, 1983. However, the Harbens included a provision permitting them to take possession of the house on August 17, 1983. Mr. Carvell told the Harbens that he would present their offer to Mr. Hutton.

Mr. Hutton had no knowledge of the terms of this agreement until Mr. Carvell called him on the evening of August 16, 1983. He was unaware that the Harbens had decided to offer him a thousand dollars less than than the price he had mentioned to Mr. Carvell or that they wanted the refrigerator left behind. However, he agreed to the Harbens' terms. Mr. Carvell left the Harbens at his office and met with Mr. Hutton who signed the contract.

The Harbens moved into the house the next day. They began to have problems immediately. On the day they moved in, there was no hot water in the house, and the air conditioning was not cooling the second floor. They called Mr. Carvell about these problems, and they were corrected.

Mr. Carvell ran an advertisement for his real estate company in the August 23, 1983 edition of *The Pulaski Citizen.* The advertisement contained a listing for the Hutton house and a notation that it had been sold. Mr. Carvell did not seek permission from Mr. Hutton or the Harbens to run this advertisement and explained at trial that he included the house in the newspaper advertisement because it gave the impression that he was doing a good business.

After the closing, the Harbens went through the house and made a list of everything that they could find wrong or that they wanted changed. The list included problems with the ovens, the electrical wiring, the basement, and an upstairs drain pipe. On September 18, 1983, they gave a copy of this list to Mr. Carvell. Mr. Carvell gave a copy of the list to Mr. Hutton.

The Harbens and Mr. Hutton had never talked with each other up to this point. They met for the first time in late Septem-

ber after the Harbens had been living in the house for approximately five weeks. Mr. Hutton came to the house one evening bringing a copy of the Harbens' problem list with him. He walked with the Harbens through the house to discuss their problems. Mr. Hutton agreed with some of the Harbens' complaints. While he did not feel that he was legally bound to correct the problems, he told the Harbens that he would do what was "ethically and morally right".

Mr. Hutton sent several employees to the house to make the needed repairs. The Harbens were not satisfied with these repairs and became more dissatisfied as additional problems manifested themselves. The roof began to leak in October. In December, an unexplained loss of electricity caused them to move out of the house and into their recreational vehicle. At first, the Harbens thought this would be temporary; however, they were required to spend Christmas in their recreational vehicle.

The Harbens eventually refused to permit Mr. Hutton's workers to make any more repairs. They contacted other contractors to obtain estimates of the cost to make the repairs they thought were needed. In February, 1984, they decided that the house was not safe to live in because of problems with the electrical wiring. They moved all their belongings into one part of the house and never lived there again. They have never made any of the repairs they insist should be made because of the cost.

On February 28, 1985, the Harbens filed an action for fraud and misrepresentation against Mr. Hutton in the Chancery Court for Giles County. They alleged that misrepresentations had been made relating to the house's metal roof, the electrical wiring, the heating system and the amount of the electric bills, the plumbing and septic tank, the beams under the first floor, the renovation of the walls and the installation of the wall paper, and the chimneys. Mr. Hutton denied making any misrepresentations to the Harbens and asserted many of the problems with the house were due to

the Harbens' failure to maintain the house properly after they moved out.

The trial began on August 22, 1985 and on August 23, 1985 was recessed until October 2, 1985. Mr. Hutton discharged his lawyer the week before the trial was scheduled to resume. The trial court refused to grant a continuance to enable the new lawyer to familiarize himself with the case but permitted Mr. Hutton's former lawyer to withdraw. Thus, Mr. Hutton was required to represent himself without the assistance of counsel during the final three days of trial.

The trial court took the case under advisement on October 4, 1985 and issued its memorandum opinion on October 30, 1985. The trial court determined that the Harbens had relied on Mr. Carvell's representations concerning the condition of the house and that Mr. Carvell was acting as Mr. Hutton's agent in the transaction. The trial court declined to rescind the contract and instead awarded the Harbens $42,000 in damages.

The Harbens filed a motion requesting the trial court to increase the amount of damages by $70,409. Mr. Hutton filed a motion for a new trial. The trial court denied all the post-trial motions, and both parties appealed.

## II.

The Harbens insist that Mr. Carvell induced them to purchase Mr. Hutton's house by misrepresenting its condition. Mr. Hutton never dealt directly with the Harbens. However, a landowner may be liable to a purchaser for the misrepresentations of his broker or agent. *Caughron v. Stinespring*, 132 Tenn. 636, 641, 179 S.W. 152, 153 (1915); *Alexander v. C.C. Powell Realty Co.*, 535 S.W.2d 154, 157 (Tenn.Ct. App.1975). Thus, Mr. Hutton could be liable to the Harbens for Mr. Carvell's misrepresentations if Mr. Carvell was acting as his agent in this transaction. The trial court concluded that Mr. Carvell was acting as Mr. Hutton's agent. Thus, the controlling question in this case is whether the largely undisputed evidence concerning the

parties' dealings supports the trial court's conclusion.

■ Determining whether an agency relationship exists requires an examination of the conduct and relationship between the parties. *V.L. Nicholson Co. v. Transcon Investment and Financial Ltd., Inc.*, 595 S.W.2d 474, 483 (Tenn.1980); *Kerney v. Aetna Casualty and Surety Co.*, 648 S.W. 2d 247, 252–53 (Tenn.Ct.App.1982). An agency relationship does not require an explicit agreement, contract or understanding between the parties. *Electric Power Board of Metropolitan Government of Nashville and Davidson County v. Woods*, 558 S.W.2d 821, 824 (Tenn.1977); *Nidiffer v. Clinchfield Railroad Co.*, 600 S.W.2d 242, 245 (Tenn.Ct.App.1980); *Rich Printing Co. v. Estate of McKellar*, 46 Tenn.App. 444, 478, 330 S.W.2d 361, 376 (1959). If the facts establish the existence of an agency relationship, it will be found to exist whether the parties intended to create one or not. *Smith v. Tennessee Coach Co.*, 183 Tenn. 676, 680–81, 194 S.W. 2d 867, 869 (1946); *Kerney*, 648 S.W.2d at 252–53.

■ An agency relationship cannot be proven by the extrajudicial statements of the agent alone. *John J. Heirigs Construction Co. v. Exide*, 709 S.W.2d 604, 608 (Tenn.Ct.App.1986); *Sloan v. Hall*, 673 S.W.2d 548, 551 (Tenn.Ct.App.1984); *Testerman v. Home Beneficial Life Insurance Co.*, 524 S.W.2d 664, 670 (Tenn.Ct.App. 1974). Its existence must be traceable to the principal, *Sloan*, 673 S.W.2d at 551; *Umstattd v. Metropolitan Life Insurance Co.*, 21 Tenn.App. 312, 320, 110 S.W.2d 342, 347 (1937), because an agency relationship is created by the actions of the principal, not the actions of the agent. Restatement (Second) of Agency § 27 comment b (1957). Thus, an owner must say or do something to make a broker his agent before a court will find that an agency relationship exists between the owner and the broker. *Walker v. Huckabee*, 10 Ark.App. 165, 661 S.W. 2d 460, 462 (1983).

The trial court based its conclusion that Mr. Carvell was acting as Mr. Hutton's agent on the following findings of fact: (1) Mr. Carvell contacted Mr. Hutton to find out if his house was for sale; (2) Mr. Carvell obtained the keys to the house from Mr. Hutton; (3) Mr. Carvell showed Mr. Hutton's house to the Harbens; (4) Mr. Carvell made representations to the Harbens concerning the condition of the house; and (5) Mr. Hutton agreed to pay Mr. Carvell's commission. The evidence supports these findings of fact. However, these facts taken with the others found by the trial court do not support the conclusion that Mr. Carvell was acting as Mr. Hutton's agent.

The trial court's analysis placed too much emphasis on the broker's conduct when it should have focused upon the principal's conduct. The largely undisputed evidence concerning the parties' dealings show that Mr. Carvell was acting, at best, as the Harbens' agent or, at worst, primarily in his own interests. See *Livas v. Kodrick*, 143 Ill.App.3d 1097, 98 Ill.Dec. 85, 87, 493 N.E.2d 1106, 1108 (1986).

■ Mr. Hutton's agreement to pay Mr. Carvell's commission is the strongest circumstance supporting the trial court's conclusion. While this is a circumstance that can aid in determining the identity of an agent's principal, *Billington v. Crowder*, 553 S.W.2d 590, 593, (Tenn.Ct.App.1977), it is not sufficient, by itself, to establish the existence of an agency relationship. *Cook v. Westersund*, 127 Cal.App.3d 192, 179 Cal.Rptr. 396, 400 (1981); *Century 21 Quality Properties, Inc. v. Chandler*, 103 Idaho 193, 646 P.2d 435, 439 (1982). A broker can still be found to represent the buyer even when the seller has agreed to pay the broker's commission. *Norville v. Palant*, 25 Ariz.App. 606, 545 P.2d 454, 457 (1976); *Wolf v. Price*, 244 Cal.App.2d 165, 52 Cal.Rptr. 889, 894 (1966); *Menzel v. Morse*, 362 N.W.2d 465, 475 (Iowa 1985); *Antle v. Haas*, 251 S.W.2d 290, 293 (Ky.Ct. App.1952).

The Harbens are the ones who decided to include in their offer the provision that Mr. Hutton would pay Mr. Carvell's commission. Mr. Hutton played no part in formulating this provision. He merely accepted it when he signed the contract presented to

him by Mr. Carvell. If anything, Mr. Carvell's decision to include this in the contract he helped the Harbens prepare supports the conclusion that he was acting on behalf of the Harbens. Requiring the seller to pay the buyer's agent's commission is obviously in the buyer's interest, not the seller's.

In addition to determining who pays the commission, there are other relevant questions that will aid in identifying who an agent's principal is. These questions include who first set the agent in motion; who can control the agent's actions; and whose interests is the agent to protect. *Roby v. Decatur Steel Erectors, Inc.,* 59 Ill.App.3d 720, 17 Ill.Dec. 71, 75, 375 N.E.2d 1355, 1359 (1978). When the evidence in this case is reviewed in light of these questions, it becomes apparent that Mr. Carvell was not Mr. Hutton's agent.

█ The Harbens first approached Mr. Carvell seeking his assistance in locating a house to buy. Ordinarily, a broker is the agent of the first party to employ him. *Wolf v. Price,* 244 Cal.App.2d 165, 52 Cal. Rptr. 889, 894 (1966); *Price v. Martin,* 207 Va. 86, 147 S.E.2d 716, 718 (1966). *See generally* 12 C.J.S. *Brokers* §§ 31 & 32 (1980); 12 Am.Jur.2d *Brokers* § 67 (1964). This rule holds true even when the seller has agreed to pay the broker's commission. *Menzel v. Morse,* 362 N.W.2d 465, 475 (Iowa 1985).

█ Mr. Carvell was acting on behalf of the Harbens when he first contacted Mr. Hutton. In fact, all of Mr. Carvell's actions were done at the Harbens' request. Mr. Carvell did not seek or obtain a listing agreement or any other authorization from Mr. Hutton to sell the house. He merely inquired whether the house was for sale. Generally, an owner's expression of willingness to sell in response to a broker's inquiry is not sufficient to create an agency relationship between the owner and the broker. *Sackett v. Ford,* 1 Tenn.App. 506, 508 (1925). *Accord: Johnson v. Orrell,* 231 N.C. 197, 56 S.E.2d 414, 417 (1949); *A.J. Meyer & Co. v. Schulte,* 189 S.W.2d 183, 188 (Mo.Ct.App.1945); *Ostendorf-Morris Co. v. Slyman,* 6 Ohio App.3d 46, 452 N.E.

2d 1343, 1345 (1982). *See also Billington,* 553 S.W.2d at 595.

The Harbens and Mr. Carvell decided upon the terms of their offer to Mr. Hutton. They also prepared the contract that eventually formed the basis of the agreement between the Harbens and Mr. Hutton. While there is evidence that Mr. Carvell discussed the amount of land that would be included with the house with Mr. Hutton, there is no evidence that he discussed any of the other contract terms with Mr. Hutton prior to seeking his acceptance of the Harbens' offer.

█ Finally, Mr. Hutton had every right to assume that this sale was entirely proper when he signed the contract. The contract itself contained a provision stating that the Harbens were not relying upon any representation not included in the contract. Furthermore, as the trial court found, Mr. Hutton made no representations of any sort to either the Harbens or Mr. Carvell and was ignorant of the representations Mr. Carvell had made. Under these circumstances, it is difficult to argue that Mr. Hutton should be responsible for Mr. Carvell's representations. *Kirby v. Frith,* 311 S.W.2d 799, 802 (Ky.Ct.App.1958).

### III.

The Harbens have no cause of action against Mr. Hutton since we have determined that the facts do not support the conclusion that Mr. Carvell was acting as Mr. Hutton's agent. It is, therefore, unnecessary to consider any of the other issues raised by either Mr. Hutton or the Harbens. The judgment of the trial court is vacated, and the case is remanded with directions that it be dismissed. The costs of this appeal are taxed to the Harbens and their surety for which execution, if necessary, may issue.

TODD, P.J., and CANTRELL, J., concur.