## HOSPITAL UNDERWRITING GROUP, INC.

v.

## SUMMIT HEALTH LTD., Mesa General Hospital, Inc., Dr. James Baumann and Sarahmarge Crigler.

### Civ. A. No. 3:88–0297.

United States District Court,
M.D. Tennessee,
Nashville Division.

July 5, 1989.

Jay S. Bowen, Bass, Berry & Sims, Nashville, Tenn., for plaintiff.

Ames Davis and Joseph A. Woodruff, Waller, Lansden, Dortch & Davis, Nashville, Tenn., and Kenneth L. Tucker, Daniel P.J. Miller, Tucker & Jessen, Michael Jessen, Phoenix, Ariz. and James G. Thomas, Neal & Harwell, Nashville, Tenn., for defendants.

## MEMORANDUM

WISEMAN, Chief Judge.

This action for declaratory judgment is currently before the Court on five motions. The parties have fully briefed each motion and defended their positions in oral argument. Defendants Mesa General Hospital, Inc. (Mesa), and Dr. James Baumann have moved to be dismissed for lack of personal jurisdiction. The Court grants their motion. Defendant Sarahmarge Crigler has adopted the motion for summary judgment which Mesa and Baumann have filed in the alternative. This motion is effectively a cross motion for summary judgment, responding to the motion of plaintiff, Hospital Underwriting Group, Inc. (HUG), on the issue of whether HUG is liable under an insurance policy it issued to defendant Summit Health, Ltd. (Summit). For the reasons stated below, the Court rules in favor of Mrs. Crigler on the liability issue. HUG and Summit have also filed cross motions for summary judgment on the issue of whether Summit is required to indemnify HUG for any liability which HUG might incur under the policy. The Court denies both of the motions on the indemnity issue. Finally, Summit has moved to substitute Mrs. Crigler as a party, but the Court finds it unnecessary to rule upon this motion.

## I. FACTS

### A. GENERAL BACKGROUND

Summit, a California entity, indirectly owns a large number of hospitals. Its wholly-owned subsidiary, Summit Hospital Corp., owns defendant Mesa, an Arizona corporation whose sole business is the operation of Mesa General Hospital in Mesa, Arizona. In other words, defendant Mesa is a wholly-owned subsidiary of a wholly-owned subsidiary of defendant Summit.

Defendant Baumann is a Doctor of Osteopathy who, as an independent contractor, works as an emergency room physician at Mesa General Hospital on a part-time,

hourly basis. While in the emergency room on December 24, 1985, Dr. Baumann treated a patient, Oscar Crigler, who died shortly thereafter. The patient's widow, Sarahmarge Crigler, subsequently sued Mesa and Dr. Baumann, received a verdict of $4,000,000 and settled for $2,000,000 plus an assignment of rights under the excess liability policy written by HUG, which is at issue in this suit. By virtue of that assignment, Mrs. Crigler has been joined as a defendant.

Plaintiff is a Tennessee corporation with its principal place of business in Tennessee. It insures groups of hospitals and certain physicians for, among other things, their professional and general liability risks. HUG issued Policy No. 85–100 to Summit, effective October 1, 1985, to June 1, 1986, with a liability limit of $25,000,000 less a $2,000,000 deductible per occurrence. Defendants Mesa and Baumann played no role in procuring the policy or negotiating its terms. Only HUG and Summit were parties to the transaction.

Defendant Summit is the sole "Member Insured" under the policy.[1] As the Member Insured, Summit became a shareholder in HUG.[2] Although neither was named specifically in the policy, Mesa and Baumann were among the "Insured" under the policy. The policy defines "Insured" as "any person or organization qualifying as an Insured in the Persons Insured provision of the applicable insurance coverage."[3] As an "organization in which the Member Insured or its subsidiaries has or acquires a financial interest of 50% or more," defendant Mesa qualifies for coverage as a "Named Insured."[4] Baumann qualifies by virtue of an "Emergency Room Endorsement" to the policy.[5] The policy specifies that "[t]he insurance afforded applies separately to each Insured against whom claim is made or suit is brought."[6]

The policy's notice requirements lie at the heart of this dispute. They provide:

3. Insured's Duties in the Event of Occurrence, Claim or Suit:

(A) In the event of an occurrence (even within the applicable deductible) written notice containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the Insured to the Company or any of its authorized agents as soon as practicable after any of the following have knowledge of the occurrence: (1) the Member Insured, if an individual, (2) any partner of the Member Insured, if the Member Insured is a partnership, (3) any officer located at the Member Insured's principal offices, if the Member Insured is a corporation, or (4) any person designated by the Member Insured to give such notice. The Member Insured shall designate a reasonable number of persons to give such notice. This written notice shall be made in such a report form as the Company shall from time to time determine.

(B) If claim is made or suit is brought against the Insured, the Insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representative.

(C) The Insured shall cooperate with the Company and upon the Company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity

---

1. Defendants Crigler, Baumann and Mesa General Hospital's List of Exhibits in Support of Defendants' Motion for Summary Judgment (Defendants' Exhibit List), Exhibit No. 5 (HUG Policy), Declaration Sheet (filed 12/15/88). The aggregate limit of liability under the policy is $30,000,000.

2. HUG Policy, Declaration Sheet and p. 23.

3. *Id.* at 23. In this case, the applicable insurance coverage is Hospital Professional Liability Insurance. *See id.* at 10–12.

4. *Id.* at 11 & 23.

5. *Id.* at Endorsement No. 2.

6. *Id.* at 23.

against any person or organization who may be liable to the Insured because of injury or damage with respect to which insurance is afforded under this Policy, and the Insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of the accident.

4. Action Against Company: No action shall lie against the Company unless as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy, including, but not limited to, the payment of Premium and Retrospective Premium Adjustment, nor until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and the Company.[7]

HUG has no department for handling or investigating claims. HUG relies upon its member hospital groups, i.e. the Member Insureds, to handle claims and to provide HUG with information concerning the claims.[8] Samuel Dillard, Vice President of HUG, has testified,

the way we operate, we don't have the outside claims staff. We look directly to the member hospital group for the claims handling function.... We rely on the member hospital group claims staff or risk management staff to provide us with information. We don't go direct to the hospital or the doctor, if there's a doctor involved—or even to the attorney, unless

we get permission from the member hospital group.[9]

Mr. Dillard's deposition testimony is consistent with the actual arrangement between Summit and HUG. HUG provided Summit with a claims procedure manual. It is undisputed that the manual was not addressed or distributed to any of the insureds under the policy except Summit. The claims procedure manual provides that in instances such as Mr. Crigler's death a "First Report of Claim form will be forwarded to HUG by the [Member Hospital Group]."[10] The Manual further provides that the Member Insured will provide periodic reports to HUG and advise HUG of closing of the case and of its disposition. It also provides that the Member Insured and/or its primary insurer will "manage and administer those claims which lie within the [Member Insured's] retention."[11] The Manual also provides that HUG will closely monitor claims, determine the extent of information to be forwarded to HUG and determine whether to set a reserve in excess of the Member Insured's retention.[12] The manual does not mention any insured other than the member insured and establishes no mechanism for other insureds to communicate with HUG.

Summit's standard procedure for receiving claims squares with HUG's view that Summit, as the Member Insured, was a conduit of information to HUG concerning claims.[13] All policies were kept at the corporate offices of Mesa's parent in Los Angeles. As a rule, in the event of a claim, Mesa was to notify Summit and Summit's claims administrator, Akros Medicos Enterprises, Inc. Nobody at Mesa General Hospital had any contact with HUG. Under Summit's and Mesa's procedures, the risk management department at Summit was responsible for communicating with the ap-

---

7. *Id.* at 24–25.

8. Defendants' Exhibit List, *supra* note 1, Exhibit No. 6, Deposition of Samuel Dillard at p. 32 (taken 11/29/88) (Dillard deposition).

9. *Id.* at 44–45.

10. Defendants' Exhibit List, *supra* note 1, Exhibit No. 8, HUG Claims Procedure Manual, P. 1

(Manual). The "First Report of Claim" forms were distributed only to Summit.

11. *Id.* at 1–2.

12. *Id.*

13. *See* Dillard Deposition, *supra* note 8, at 32.

propriate insurance carrier, notifying it of any unusual occurrences or lawsuits, and filing incident reports.[14]

Mr. Judd Osten provides the final link in the chain of communications between Mesa and Summit and HUG. Mr. Osten is Vice President of Summit and Vice President and Secretary of Mesa. He works in Summit's Los Angeles offices. He became aware of the HUG Policy when he joined Summit in July, 1986.[15] Mr. Osten would receive complaints against Mesa. If they were related to risk management or insurance matters, he would refer them to the risk management department. Once referred to risk management, neither Mr. Osten nor anyone at Mesa would follow up on matters to assure that proper notice had been given to the insurers.[16]

## B. CHRONOLOGY OF EVENTS

The relationships sketched above were in place when Mrs. Crigler served Dr. Baumann and Mesa with her complaint in September, 1986. Dr. Baumann treated Oscar Crigler in the emergency room at Mesa for respiratory distress on December 24, 1985. Mr. Crigler was discharged the same day, and died a few hours later. Some time after that, Dr. Baumann learned that an attorney had requested Mr. Crigler's medical records.[17] On September 16, 1986, Mrs. Crigler filed a wrongful death action against Mesa, Dr. Baumann, and others, but not Summit, in the Superior Court of the State of Arizona in and for Maricopa County.[18] Upon receipt of the complaint, Dr. Baumann notified both Mark Werber, Executive Director of Mesa General Hospital, and Mutual Insurance Company of America (MICA), Dr. Baumann's private malpractice insurer. Mr. Werber sent copies of the summons and complaint to Akros

who began to investigate. When Mesa was served shortly thereafter, Summit retained defense counsel. Meantime, MICA had also retained defense counsel, who filed an answer on behalf of Dr. Baumann. Upon investigation, however, MICA discovered a restrictive endorsement excluding Dr. Baumann from coverage for his emergency room work. On October 30, 1986, MICA tendered Dr. Baumann's defense to Mesa. A week later, Dr. Baumann received confirmation from MICA's counsel that Mesa and its insurer, Meridian Insurance Co., were providing coverage and legal defense.

During discovery, in an attempt to provide information to Mrs. Crigler, defense counsel inquired about the relevant policy limits. Summit provided a declarations page indicating that the Meridian policy had a limit of $8,000,000. At some time before trial, defense counsel rejected a settlement demand of $650,000. On January 20, 1988, a jury returned a verdict for Mrs. Crigler and awarded her $4,000,000.

After the verdict, defense counsel learned that Meridian's coverage in fact was limited to $2,000,000. On January 25, 1988, Summit notified HUG of the Crigler claim. This was the first time HUG had actual notice of the claim. On or about February 6, Dr. Baumann and Summit received a letter dated February 4 from HUG Vice President Samuel Dillard. The letter reserved HUG's rights under the policy based upon an alleged breach of its notice provisions.[19] This was the first that Dr. Baumann actually learned of the HUG policy. Also, nobody at Mesa other than Judd Osten knew of the HUG policy before this time. In a letter dated March 28, 1988, HUG denied coverage on the Crigler claim. On March 31, 1988, HUG filed this suit.

14. Defendants' Exhibit List, *supra* note 1, Exhibit No. 3, Judd Osten Deposition Excerpts, at 24–25 & 42–43 (taken 7/21/88) (Osten Excerpts I).

15. Attachment to Plaintiff's Reply to Defendants' Responses to Plaintiff's Motion for Summary Judgment and Response to Defendants' Cross–Motions for Summary Judgment (filed 1/12/89) (Reply Attachments), Judd Osten Deposition Excerpt, p. 18 (Osten Excerpts II).

16. Osten Excerpts I, *supra* note 14, at 25.

17. Reply Attachments, *supra* note 15, Excerpts of Baumann Deposition at 19–20 (taken 7/21/88) (Baumann Excerpts).

18. *See* Defendants' Exhibit List, *supra* note 1, Exhibit No. 1, Crigler Complaint.

19. *See* Affidavit of Samuel Dillard (filed 10/15/88).

Three weeks later, on April 20, 1988, Mrs. Crigler entered into a settlement agreement with Mesa, Baumann, Summit and others.

Under the terms of the settlement agreement, Mrs. Crigler agreed to accept in various forms a payment of $2,000,000. In addition, Mrs. Crigler took an assignment of rights from the parties to the agreement, including Summit, Mesa and Baumann. The assignment comprised "any and all rights, claims, demands, causes of action or suit of any kind" which the parties might have to recover insurance proceeds or damages on the $2,000,000 of the jury's award remaining outstanding after the settlement. The agreement acknowledged the pendency of HUG's claim in this Court. The agreement relieved the parties of any obligation to appear and defend HUG's suit on the issue of insurance coverage. Mrs. Crigler agreed to cooperate in defending the indemnity claim and to allow the parties to the settlement to obtain separate counsel, intervene as counsel of record, and defend the claim within their discretion. Mrs. Crigler agreed to "forever refrain" from attempting to recover the excess $2,000,000 except through the parties' excess insurance coverage. The agreement was executed in Arizona and provides that it is governed by Arizona law.[20]

## II.  LEGAL DISCUSSION

### A.  THIS COURT DOES NOT HAVE IN PERSONAM JURISDICTION OVER DEFENDANTS MESA AND BAUMANN.

Mesa is an Arizona corporation with its only business in Arizona. Dr. Baumann's residence and domicile is Arizona. Neither has business in or owns property in Tennessee. Mesa has purchased goods from three Tennessee vendors and used Federal Express, a Tennessee corporation. None of these transactions, however, is related to HUG's claim. Mesa and Baumann have only two possible connections to Tennessee.

First, they are included as "insureds" under Summit's policy with HUG. Second, they were parties to the settlement agreement with Mrs. Crigler, which contemplated the possibility that Mrs. Crigler would attempt to recover under the HUG policy. Plaintiff seizes upon these two contacts to support its claim that this Court has personal jurisdiction over Mesa and Baumann. Plaintiff contends that Summit, acting as Mesa and Baumann's agent, subjected them to the jurisdiction of this Court by consciously choosing to deal in Tennessee and purposefully availing itself of the privilege of acting and causing consequences in Tennessee. Plaintiff further contends that Mesa and Baumann intentionally entered the settlement agreement with Mrs. Crigler, knowing that it would have sufficient consequences in Tennessee to justify finding personal jurisdiction over the defendants. The Court disagrees with both arguments.

Tennessee law governs whether this Court has personal jurisdiction over Mesa and Baumann. *Pickens v. Hess*, 573 F.2d 380, 385 (6th Cir.1978). The reach of Tennessee's Long–Arm Statute, Tenn.Code Ann. § 20–2–214, extends as far as the due process clause of the United States Constitution allows. *Masada Investment Corp. v. Allen*, 697 S.W.2d 332 (Tenn.1985). To find in personam jurisdiction over a nonresident, the non-resident not only must have "minimum contacts" with the forum, *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), which have a "substantial connection" to the cause of action, *McGee v. International Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957), but also must "purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state." *Southern Machine Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir.1968). *Accord Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). The Sixth Circuit has

---

**20.** *See* Attachment to Memorandum in Support of Plaintiff's Motion for Summary Judgment (filed 10/25/88).

held that in certain circumstances the actions of a non-resident defendant's agent may demonstrate purposeful availment of such privileges by the defendant. *Chattanooga Corp. v. Klingler,* 704 F.2d 903, 907–08 (6th Cir.1983).

Plaintiff's first argument relies primarily on the holding in *Klingler.* But that reliance is misplaced. Mr. Klingler was the president of a small closely-held corporation, who negotiated a substantial sale of corporate assets and an assignment of its patents to a Tennessee corporation. As part of the arrangement, the Tennessee corporation made substantial continuing royalty payments to all the shareholders of the corporation. The Sixth Circuit concluded that "Klingler was clearly acting as agent for all of the shareholders in negotiating" the deal. *Id.* at 907. According to the court, the passive shareholders

> acted through Klingler to establish at least minimal contacts in Tennessee and to cause substantial consequences in Tennessee.... [Plaintiff's] action arose from activities of Klingler, as agent for all the [shareholders] in Tennessee.... [The shareholders] therefore did purposefully avail themselves of the privilege of acting and causing consequences in Tennessee through their own involvement and, primarily, through the agency of Klingler, they made a conscious choice to deal with Chattanooga, located in Tennessee and producing products there, knowing of potential consequences within Tennessee.

*Id.* Consequently, the court held that the passive shareholders' contacts with Tennessee were "such that they could 'reasonably anticipate being haled into court' in Tennessee[,] *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490, 501 (1980)," and that finding in personam jurisdiction over them was reasonable. 704 F.2d at 907.

■ The holding in *Klingler* turns upon the court's conclusion that Mr. Klingler acted as the shareholders' agent when he negotiated the sale and assignment. In the case at bar, however, the facts do not support a finding that Summit was acting as

an agent for Mesa or Baumann when it negotiated and purchased the policy from HUG. In Tennessee, the essential test for determining whether an agency relationship exists is the right of control. *Jack Daniel Distillery v. Jackson,* 740 S.W.2d 413, 416 (Tenn.1987). The party asserting agency must demonstrate that the relationship exists. *Id.* Plaintiff has failed to come forward with any evidence to show that either Mesa or Baumann had a right to object to, let alone control, Summit's decisions concerning excess insurance coverage. Indeed, such a conclusion is patently unreasonable in light of the defendants' relation to Summit. *Cf. General Acc. Ins. Co. v. Old Republic Int'l Corp.,* 648 F.Supp. 634, 637 (N.D.Ill.1986) (parent not subject to control of subsidiaries when negotiating and procuring insurance policy, and therefore is not agent of subsidiaries for purpose of submitting them to in personam jurisdiction); *Nidiffer v. Clinchfield R.R. Co.,* 600 S.W.2d 242, 246 (Tenn.App. 1980) (employer is not agent of its employees in the procurement of group insurance policy). Thus, even though Summit consciously chose to deal in Tennessee and purposefully availed itself of the benefits of doing so, its actions are not sufficient to subject defendants Mesa and Baumann to in personam jurisdiction in Tennessee.

■ Plaintiff also argues that Mesa and Baumann consciously entered into a settlement agreement with Mrs. Crigler which they knew would have consequences in Tennessee. Merely causing a consequence in the forum state, however, is not enough to justify in personam jurisdiction. The cause of action must arise from the activity connected to the forum and the consequences must be substantial enough to make the exercise of jurisdiction reasonable. *Southern Machine Co. v. Mohasco,* 401 F.2d at 381 (6th Cir.1968). Plaintiff's cause of action does not arise out of the settlement agreement. It cannot, therefore, support a finding that this Court has personal jurisdiction over Mesa and Baumann.

In sum, the contacts of Mesa and Baumann with Tennessee are not such that they could "reasonably anticipate being haled into court" in Tennessee. *World–Wide*

*Volkswagen Corp. v. Woodson,* 444 U.S. at 297, 100 S.Ct. at 567. To the contrary, finding personal jurisdiction over them would offend "traditional notions of fair play and substantial justice." *Id.* at 292, 100 S.Ct. at 564. Therefore, Mesa and Baumann are dismissed.

## B. HUG IS LIABLE TO MRS. CRIGLER UNDER ITS POLICY.

■ The issue presented by cross motions for summary judgment is whether Summit's failure to provide actual notice of the Crigler claim to HUG in a timely fashion relieved HUG entirely of its liability for the Crigler claim. Although the issue is one of first impression in Tennessee, its resolution turns upon traditional principles of agency law. Generally, where an agent is acting within the scope of its agency, actions by and notice to the agent are imputed to the principal. Thus, if Summit was the agent of Mesa and Baumann for the purpose of providing notice to HUG, then Mrs. Crigler (who stands in the shoes of Mesa and Baumann) must bear the consequences of Summit's failure. On the other hand, if Summit was HUG's agent for the purpose of receiving notice from Summit's insured subsidiaries, then Mesa and Baumann fulfilled their obligation and HUG is liable under the policy to satisfy the Crigler claim. Applying Tennessee law to the facts before it, the Court finds that Summit was HUG's agent for the purpose of receiving notice from Summit's insured subsidiaries. Therefore, HUG is liable to Mrs. Crigler under its policy with Summit for the unsatisfied portion of her judgment against Mesa and Baumann.[21]

### 1. Summit was HUG's agent for the purpose of receiving notice of claims against insured hospitals and doctors.

In Tennessee, the facts and circumstances of each case determine whether an agency relationship exists. *Jack Daniel Distillery v. Jackson,* 740 S.W.2d 413, 416 (Tenn. 1987); *V.L. Nicholson Co. v. Transcon Invest. & Fin. Ltd., Inc.,* 595 S.W.2d 474, 483 (Tenn.1980); *Harben v. Hutton,* 739 S.W.2d 602, 606 (Tenn.App.1987). An agency relationship may exist even where there is no explicit agreement or understanding. *E.g., Electric Power Bd. of Met. Gov't v. Woods,* 558 S.W.2d 821, 824 (Tenn. 1977). Such a relationship does exist wherever the principal authorizes the agent to act for the principal's benefit and retains the right to control the agent's conduct. *Thomson McKinnon Sec., Inc. v. Moore's Farm Supply, Inc.,* 557 F.Supp. 1004, 1011 (W.D.Tenn.1983); *Jack Daniel,* 740 S.W.2d at 416; *Hussmann Refrig., Inc. v. South Pittsburg Assoc.,* 697 S.W.2d 588, 592 (Tenn.App.1985). Without the right of control, there is no agency. *Jack Daniel,* 740 S.W.2d at 416; *Nidiffer v. Clinchfield R.R. Co.,* 600 S.W.2d 242, 245 (Tenn.App.1980).

The arrangement between Summit and HUG for handling and investigating claims against insured hospitals or doctors yielded benefits for both HUG and the insureds. The benefits to HUG are two-fold. First, it is more efficient to channel all claims under the policy through one conduit rather than to receive claims from a multitude of sources. The consequent reduction in administrative costs is profitable to the insurer. Second, the reduction in resources devoted to policy administration enables the insurer to realize a higher volume of sales and a greater diversification of its risk portfolio. This is also profitable to the insurer. The arrangement is beneficial to Summit and to the insured hospitals and doctors in that some portion of the increased efficiency and economy is reflected in the premiums. *Cf. Nidiffer v. Clinchfield R.R. Co.,* 600 S.W.2d 242, 245 (Tenn.

**21.** HUG has argued that the terms of the agreement under which Mesa and Baumann assigned their rights under the policy to Ms. Crigler effectively released HUG from any liability under its policy. The Court does not agree. By virtue of the judgment against them, Mesa and Baumann became legally obligated to pay damages to Ms. Crigler. *See* HUG Policy, section 3.2. The Settlement Agreement by which Ms. Crigler agreed not to execute against the assets of Mesa or Baumann on the judgment in exchange for an assignment of rights under the HUG Policy does not relieve HUG of its contractual liability. *See Siligato v. Welch,* 607 F.Supp. 743 (D.Conn. 1985); *Deblon v. Beaton,* 103 N.J.Super. 345, 247 A.2d 172 (1968).

App.1980) (purchasing a group insurance policy yields lower rates and benefits employees); *Norby v. Bankers Life Co.*, 304 Minn. 464, 231 N.W.2d 665, 668–69 (1975) (discussing mutual benefits of group insurance in labor situations); *Elfstrom v. New York Life Ins. Co.*, 63 Cal.Rptr. 35, 63 Cal.Rptr. 35, 41, 432 P.2d 731, 737 (1967) (employer administration of group policy enables insurer to increase volume of sales and reduce administrative costs).

Although the insured hospitals and doctors and the insurer benefit from this arrangement, only HUG had the right to control Summit's actions. The policy itself provided that written notice shall be given in "such a report form as [HUG] shall from time to time determine."[22] The reporting requirements were set forth in HUG's Claims Procedure Manual, which HUG authored and elected to issue to Summit but not to the additional insureds. HUG retained discretion to require complete files as they develop, detailed periodic reports, or simple notice that the file had been closed. HUG also retained the authority to audit files. Furthermore, the manual provided that any claim will be "closely monitored by HUG" and that in certain circumstances, Summit would "continue handling the file on a day-to-day basis with all supervision and authority resting with HUG."[23] In short, HUG not only issued procedures for Summit to follow, but also provided that it may elect to exercise more constricted control over Summit's performance if it believed such a course was necessary. This demonstrates a sufficient right of control to support a finding that Summit acted as HUG's agent.[24]

The arrangement between HUG and Summit demonstrates both that Summit acted on behalf of and to the benefit of HUG and that HUG retained a right to control Summit's actions. Under Tennessee law, this arrangement constitutes an agency relationship. The scope of Summit's agency is apparent from the arrangement. HUG looked to Summit to handle claims and to provide information concerning claims to HUG.[25] HUG took no steps to make the Claims Procedure Manual available to the insured hospitals and doctors. Rather, HUG contemplated that all claims would be channeled through Summit. Therefore, Summit was HUG's agent for the purpose not only of handling claims, but also for the purpose of receiving notice of claims against the other insureds under the policy.

*2. Mesa and Baumann complied with the notice provisions of the policy by notifying HUG's agent, Summit, as soon as practicable after learning of the Crigler claim.*

Ordinarily, notice to an agent is imputed to the principal. *Corim, Inc. v. Sam Blair Co., Inc.*, 721 S.W.2d 256, 259 (Tenn.App. 1986). The rule is designed to protect persons who exercise good faith in dealing through an agent. *E.g., DeFord v. National Life & Acc. Ins. Co.*, 182 Tenn. 255, 185 S.W.2d 617, 620 (1945). For the rule to apply, four conditions must be satisfied. First, the agent must receive notice while acting within the scope of his authority. *E.g., Ford Motor Co. v. Weaver*, 680 F.2d 451, 457 (6th Cir.1982); *Hurst Boillin Co. v. Jones*, 152 Tenn. 535, 279 S.W. 392, 393 (1926). Second, the notice must pertain to matters within the scope of the agent's authority. *E.g., Ford Motor Co.*, 680 F.2d at 457; *Hurst Boillin*, 279 S.W. at 393.

---

**22.** HUG Policy, *supra* note 1, at 25.

**23.** Manual, *supra* note 10, at 1–3.

**24.** The record contains no evidence to support a finding that either Mesa or Baumann had any right to control Summit. Indeed, it defies reason to argue that a wholly-owned subsidiary may control the actions of its parent. It stretches the bounds of reason even further to suggest that an independent contractor of a subsidiary may exercise control over the subsidiary's parent. Of course, some instances may present extenuating circumstances which suggest that a subsidiary may have some control over its parent, or an employee may have some right to control his employer, but such circumstances are not before the court. *Cf. Hale v. American Home Assurance Co. Corp.*, 224 Tenn. 650, 461 S.W.2d 384 (Tenn.1970) (employer-son acted as agent of his employee-father who also used to be co-owner of son's grocery store).

**25.** Dillard Deposition, *supra* note 8. at 44–45.

Third, the agent's interest in the matter must not be so adverse to the principal's that the agency relation is undermined. *E.g., Hurst Boillin,* 279 S.W. at 393; *Corim, Inc.,* 721 S.W.2d at 259. Fourth, the third party must reasonably expect or intend that the agent will communicate the matter to the principal. *DeFord,* 185 S.W.2d at 620; *State v. Candler,* 728 S.W.2d 756, 759 (Tenn.Crim.App.1986); *American Gen'l Life Ins. Co. v. Gilbert,* 595 S.W.2d 83, 87 (Tenn.App.1979). Notice by Mesa and Baumann to Summit of the Crigler claim satisfies these four conditions and is, therefore, properly imputed to HUG.

Summit received notice of the Crigler claim while acting within the scope of its authority and such notice plainly pertained to matters within the scope of Summit's agency. As explained above, HUG intended that notice of claims against entities other than Summit who were covered under the policy be channeled through Summit. This conclusion is supported both by the language of the policy and by the actual arrangement between HUG and Summit. The policy provides that notice be given to HUG "or any of its authorized agents."[26] Moreover, the only means available to the additional insureds to notify HUG of claims or occurrences was to do so through Summit. This standard procedure established by HUG demonstrates that Summit had the authority to receive notice of claims on behalf of HUG from entities such as Mesa and Dr. Baumann.

Furthermore, Summit and HUG shared a similar interest in efficiently resolving claims against insured hospitals and doctors. Efficient resolution results in lower premiums for Summit and higher profitability for HUG. Although HUG may have a stronger incentive than Summit to settle claims within the deductible, this is not substantial enough to undermine the agency relation between Summit and HUG. Indeed, HUG's use of Summit as a conduit of information reflects an assessment that Summit would be a reliable link in the chain of notice. These circumstances do not present the proper occasion to sanction an *ex post* reassessment of Summit's reliability.

Finally, Mesa and Baumann reasonably expected that Summit would notify its excess insurance carrier, HUG, of the Crigler claim. The record supports no other conclusion. There is not even a hint of collusion or fraud between Summit and Mesa and Baumann in the reporting omission, or of any benefits which might have conceivably accrued to the parties from collusively or fraudulently failing to report the claim. To the contrary, the record demonstrates that Mesa and Baumann acted reasonably and in good faith when they notified Summit of the Crigler claim and that they reasonably expected that Summit would notify its excess insurance carrier in the event such notice was necessary. The general rule of imputed notice is designed to protect parties who behave in this manner, *see DeFord v. National Life & Acc. Ins. Co.,* 182 Tenn. 255, 185 S.W.2d 617, 620 (1945), and should apply here.

■ The foregoing demonstrates that under Tennessee law HUG was effectively notified of the Crigler claim when Mesa notified Summit of the claim. This notice was timely under the policy. The policy required that notice be given "as soon as practicable" after the insured had knowledge of an occurrence and that notice be given "immediately" of every demand, notice, summons or process received by the insureds. Tennessee courts have interpreted the language "as soon as practicable" to impose a "duty on the insured to give notice when he becomes, or should become, aware of facts which would suggest to a reasonably prudent person that the event for which coverage is sought might reasonably be expected to produce a claim against the insurer." *Reliance Ins. Co. v. Athena Cablevision Corp.,* 560 S.W.2d 617, 618 (Tenn.1977) (citations omitted). In this case, nothing indicates that either Mesa or Baumann learned of Mr. Crigler's death until suit was filed. Nor should they have. Dr. Baumann's encounter with Mr. Crigler

---

26. HUG Policy, *supra* note 1, at 25.

appears to have been quite routine. Mr. Crigler did not die until three hours after his discharge from Mesa General. He died while traveling away from Mesa and was pronounced dead at a hospital several miles away. The only unusual event was that some time before Mrs. Crigler filed her suit, Dr. Baumann learned that an attorney had requested Mr. Crigler's records.[27] This was not an event, however, which triggered a duty to notify the insurer. Under the circumstances of this case, that duty was triggered when suit was filed. Within a week after the filing, Summit was notified of the claim.[28] Furthermore, the record indicates that Summit was fully aware of the development of each step in the litigation. This satisfies the policy's notice requirements.

█ In sum, the Court holds that Summit was HUG's agent for the purpose of receiving notice of claims against insured hospitals owned by Summit or its subsidiaries and against insured employees or independent contractors at those hospitals. Because Summit was HUG's agent, notice to Summit of such claims is properly imputed to HUG. Thus, HUG received timely notice through Summit of Mrs. Crigler's claim against Mesa and Dr. Baumann, and is liable to Mrs. Crigler under its policy with Summit for the outstanding portion of Mrs. Crigler's jury award.

## C. ON THE BASIS OF THE RECORD CURRENTLY BEFORE IT, THE COURT CANNOT DETERMINE WHETHER HUG IS ENTITLED TO INDEMNITY FROM SUMMIT FOR SATISFACTION OF THE CRIGLER CLAIM.

HUG argues that it is entitled to indemnity from Summit on the grounds that Summit's failure to perform its duty to HUG resulted in HUG's loss. Summit responds that it is not liable to indemnify HUG because paying the Crigler claim is nothing more than HUG contracted to do in the first instance. For slightly different reasons, the Court denies both motions.

Principles of indemnity are well-settled in Tennessee law. "Contracts of indemnification may be express, or an obligation to indemnity may arise by implication from the relationship of the parties[.]" *Houseboating Corp. of Amer. v. Marshall*, 553 S.W.2d 588, 589 (Tenn.1977). Under certain circumstances, an agency relation may give rise to an obligation to indemnify.

> Whenever an agent violates his duties or obligations to his principal, whether it be by exceeding his authority or by positive misconduct, or by mere negligence or omission in the proper functions of his agency, or in any other manner, and any loss of damage thereby falls on his principal, he is responsible therefor, and must make a full indemnity therefor. In such case it is wholly immaterial whether the loss or damage be directed to the property of the principal, or whether it arises from the compensation or reparation which he has been obliged to make to third persons in discharge of his liability to them for the acts or omissions of his agents. The loss or damage need not be directly or immediately caused by the act which is done or omitted to be done. It will be sufficient if it be fairly attributable to it as a natural result or just consequence.

*Wharton Transport Co. v. Bridges*, 606 S.W.2d 521, 529 (Tenn.1980), *quoting Memphis & Charleston R.R. v. Greer*, 87 Tenn. 698, 702–03, 11 S.W. 931, 933 (1889), *quoting* Storey on Agency, § 217(c). *Accord Gay & Taylor, Inc. v. American Casualty Co.*, 53 Tenn.App. 120, 381 S.W.2d 304, 305–06 (1963), *cert. denied* (1964). An agent has a duty to be skillful, diligent, and careful and to act in good faith in the performance of the principal's business. *Young v. Phillips*, 170 Tenn. 169, 93 S.W.2d 634, 636 (1936); *Gay & Taylor*, 381 S.W.2d at 305. Where the agent fails to fulfill those duties, he subjects himself to liability for any damages naturally and

---

**27.** Baumann Excerpts, *supra* note 17, at 19–20.

**28.** *See* Defendants' Exhibit List, *supra* note 1, Exhibit No. 14, Letter of 9/23/86 from Richard

L. Evans, Director, Risk Management, Summit Health Ltd. to John C. West.

proximately flowing from the breach. *Gay & Taylor*, 381 S.W.2d at 305. In short, if the agent fails to fulfill his duty of due care or good faith to the principal, and the failure proximately causes a loss to the principal, the agent is "responsible for the consequences of his own wrong." *Houseboating Corp.*, 553 S.W.2d at 589, *quoting Southern Coal & Coke Co. v. Beach Grove Mining Co.*, 53 Tenn.App. 108, 116, 381 S.W.2d 299, 302 (1963).

Tennessee courts have applied these principles in insurance cases. In *Transamerica Ins. Co. v. Parrott*, 531 S.W.2d 306 (Tenn.App.1975), an agent for the insurer failed to follow the insurer's instructions to issue to the insured an endorsement restricting coverage to travel within a specified geographic area. Because of this failure, the insured had a geographically unlimited policy. When the insured submitted a subsequent claim for a loss which occurred outside the area specified in the endorsement, the court held that the insured was covered but that the agent was liable to indemnify the insurer for the coverage which resulted from his failure to satisfy his duty. *Id.* at 312. In *Virginia Surety Co. v. Lee*, 55 Tenn.App. 501, 402 S.W.2d 714 (1964), an agent was not obligated to indemnify the insurer even though he failed to notify the company of an oral binder until after the loss occurred. The court held, inter alia, that the insurer failed to carry its burden of demonstrating that it would have cancelled the binder had it received timely notice and, therefore, that the agent's failure was not the proximate cause of the insurer's loss. 402 S.W.2d at 718. Furthermore, in *Gay & Taylor*, the court held that an adjuster was not liable to the insurance company for failing to forward case files to the company's lawyers because the insurer failed to demonstrate that the insured would have had a valid defense to suits filed against it. 381 S.W.2d at 307. Likewise, in *Maryland Cas. Co. v. F.B. Hunter & Co.*, 8 Tenn. App. 516 (1928), an agent's failure to notify the insurer of a policy's assignment did not subject the agent to liability because the company failed to show that it would not have accepted the risk had it known of the true facts. *Id.* at 523.

■ According to these cases, the insurer must demonstrate that the agent's failure to fulfill his duties proximately caused the insurer's loss. Questions of proximate cause, however, do not lend themselves easily to disposition at the summary judgment stage. The record currently before the Court reveals a genuine dispute as to whether Summit's failure to notify HUG of Mrs. Crigler's claim against Mesa and Baumann and its failure to integrate HUG into the post-judgment settlement negotiations proximately caused HUG's loss. On the one hand, HUG was not notified of the claim and this failure deprived HUG of any opportunity to participate in the defense of the claim or in pre-trial settlement negotiations. Further, the attorneys defending the Crigler claim rejected a settlement demand well within the policy's deductible, and the verdict exceeded both the demand and the deductible. Moreover, Summit's failure to pursue post-trial remedies or appeal, its failure to bring HUG into the settlement negotiations, and its negotiation of the assignment and covenant-not-to execute may not only suggest a breach of Summit's duty of good faith to HUG, but also demonstrate points where reasonable efforts might have prevented HUG's loss. On the other hand, the record suggests that HUG might not have actively participated in defending the claim or negotiating a settlement had it received notice. It might also be true that even if HUG had participated it would have employed the same analysis and arrived at the same decision to reject the settlement demand. These matters, however, are appropriately resolved through trial. Therefore, the motions of both Summit and HUG on the issue of indemnity are denied.

## III. CONCLUSION

For the reasons stated above, defendants Mesa and Baumann are dismissed for lack of personal jurisdiction. HUG is liable to Mrs. Crigler under its policy with Summit to satisfy the outstanding portion of Mrs. Crigler's judgment against Mesa and Bau-

mann. The Court denies the cross motions for summary judgment on the indemnity issue, which shall be resolved at trial.

The motion for continuance filed by Summit on May 25, 1989, is denied, and the case stands for trial on all remaining issues on August 22, 1989.